# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BLUE CROSS AND BLUE SHIELD OF FLORIDA, INC. (d/b/a FLORIDA BLUE) 4800 Deerwood Campus Parkway Jacksonville, FL 32246 | Case No. 24-3609 |
| FLORIDA BLUE MEDICARE, INC. (d/b/a FLORIDA BLUE MEDICARE) 4800 Deerwood Campus Parkway Jacksonville, FL 32246 | |
| Plaintiffs, | |
| v. | |
| DEPARTMENT OF HEALTH AND HUMAN SERVICES Hubert H. Humphrey Building 200 Independence Avenue, S.W. Washington, D.C. 20201 | |
| CENTERS FOR MEDICARE & MEDICAID SERVICES 7500 Security Boulevard Baltimore, MD 21244 | |
| XAVIER BECERRA, in his official capacity as Secretary of the United States Department of Health and Human Services Hubert H. Humphrey Building 200 Independence Avenue, S.W. Washington, D.C. 20201 | |
| CHIQUITA BROOKS-LASURE, in her official capacity as Administrator, Centers for Medicare & Medicaid Services Hubert H. Humphrey Building 200 Independence Avenue, S.W. Washington, D.C. 20201 | |
| Defendants. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Blue Cross and Blue Shield of Florida, Inc. (d/b/a Florida Blue) and Florida Blue

Medicare, Inc. (d/b/a Florida Blue Medicare) (collectively, "Florida Blue") file this Complaint for

declaratory and injunctive relief against Defendants Department of Health and Human Services

("HHS"), the Centers for Medicare & Medicaid Services ("CMS"), Xavier Becerra, in his official

capacity as Secretary of HHS, and Chiquita Brooks-LaSure, in her official capacity as

Administrator of CMS (collectively, "Defendants"). Florida Blue alleges as follows:

## INTRODUCTION

1.      Florida Blue, the leading health insurer in Florida, has been providing health

solutions to residents across the state for over 80 years.

2.      Among the health plans offered by Florida Blue are Medicare Advantage (Medicare

Part C) and stand-alone Medicare prescription drug (Medicare Part D) plans. Part C plans, or

"Medicare Advantage plans," may also include a prescription drug component (commonly referred

to as a "Medicare Advantage-Prescription Drug plan," or "MA-PD plan"). In this capacity, Florida

Blue contracts with Defendant CMS, which oversees the Medicare program, to provide Medicare

benefits to its plans' members. For its Part C plans, Florida Blue serves as a "Medicare Advantage

Organization," or "MAO." For its Part D plans, it serves as a "Part D sponsor." In this Complaint,

both types of plans are referred to collectively as "Medicare plans."

3.      As authorized by statute, Medicare plans are scored annually by CMS to assist

Medicare beneficiaries in selecting a plan. The system—known as Star Ratings—scores plans

based on a five-star scale, set in half-star increments, where one star is the lowest rating, and five

stars is the highest rating. *See* 42 C.F.R. §§ 422.162(b), 422.166(h)(1)(ii), 423.182(b),

423.186(h)(1)(ii).

4.      To arrive at a numerical rating for each plan, CMS studies and surveys Medicare plans for quality, compliance, and other metrics. CMS compiles the results of these studies and surveys for each plan and issues a score for each measure. These measures are then aggregated on a weighted basis to arrive at an overall Star Rating for each plan.

5.      These ratings have significant consequences. For one thing, they are presented as an objective measure of Medicare plan quality—CMS holds out the Star Ratings to be a "true reflection of the plan's quality," based on data that are "complete, accurate, reliable, and valid." 83 Fed. Reg. 16440, 16512 (Apr. 16, 2018). In this way, Star Ratings influence Medicare beneficiaries' choices in enrollment by distinguishing plans based on quality as determined by the CMS scoring methodology. Star Ratings also have substantial economic consequences for Medicare Advantage plans because a Medicare Advantage plan's Star Rating determines the amount of funds CMS will pay to a plan in the form of a Quality Bonus Payment.

6.      Disruptions or shortcomings affecting the receipt of health care by Medicare plan members—for example, the inability of members to readily and timely access an MA-PD plan's prescription drug benefits—can degrade a plan's rating.

7.      Extreme and uncontrollable circumstances, such as natural disasters, can directly affect Medicare beneficiaries and providers, as well as the MAOs and Part D sponsors that provide them with important medical and prescription drug coverage. These circumstances may negatively affect the underlying operational and clinical systems that CMS relies on for accurate performance measurement in the Star Ratings program, all without fault on the part of the MAO or Part D sponsor. 84 Fed. Reg. 15680, 15770 (Apr. 16, 2019).

8.      Relevant here, a CMS rule—referred to in this Complaint as the Extreme Circumstances Rule, 42 C.F.R. § 422.166(i) (applicable to Part C plans), and 42 C.F.R.

§ 423.186(i) (applicable to Part D plans)—makes it possible for Medicare plans to avoid penalties to their Star Ratings where "extreme and uncontrollable circumstances," such as severe weather events, disrupt member services negatively affecting the underlying operational and clinical systems that CMS relies on for accurate performance measurement in the Star Ratings program. The adjustment afforded by the Extreme Circumstances Rule, when applicable, minimizes the negative impacts on Medicare plans' Star Ratings when natural disasters and similar extreme events affect their ability to deliver services or meet performance targets. Without this adjustment, Medicare plans are at risk of lowered ratings and consequent harm to reputation, enrollment, and revenue that is attributable to extreme weather events beyond their control, rather than lower plan quality.

9.    That said, this adjustment for "extreme and uncontrollable circumstances" has a critical and arbitrary flaw: as CMS crafted the Extreme Circumstances Rule, it is available only if, among other things, the Secretary of HHS ("Secretary") declares a public health emergency ("PHE") under a separate statutory authority and then, under another statutory authority, waives certain requirements otherwise applicable to Medicare participants, providers, and plans. As a result, similarly situated Medicare plans operating in geographically distinct service areas that experience substantially equivalent extreme weather-related emergency disruptions may be treated differently for Star Ratings purposes if the Secretary declares a PHE for one of the service areas but does not for another.

10.    CMS adopted the Extreme Circumstances Rule in 2019. *See* 84 Fed. Reg. at 15770–72. Both when proposed and when finally adopted, CMS pointed out that the rule aimed to avoid penalizing plans for circumstances that "may negatively affect the underlying operational and clinical systems that CMS relies on for accurate performance measurement in the Star Ratings

program, all without fault on the part of the MA organization or Part D sponsor." 83 Fed. Reg. 54982, 55025 (Nov. 1, 2018); 84 Fed. Reg. at 15770. As promulgated, a Medicare plan's right to an adjustment under the Extreme Circumstances Rule is triggered where (i) its service area is deemed an "emergency area" under § 1135(g) of the Social Security Act (42 U.S.C. § 130b-5); (ii) its service area is in, *inter alia*, a county that has been designated in a major disaster declaration by the President under the Stafford Act (42 U.S.C. §§ 5121–5207) and for which the Secretary has exercised his "waiver" authority under § 1135 of the Social Security Act; and (iii) a certain minimum percentage of the plan's members reside in an area for which the Federal Emergency Management Agency ("FEMA") is providing assistance during the period of the emergency event. 42 C.F.R. §§ 422.166(i)(1), 423.186(i)(1).

11.    At least one commenter pointed out during the comment period on the proposed rule that it should suffice if a certain minimum percentage of the plan's members reside in an emergency area for which FEMA is providing assistance (*i.e.*, that the third criterion is satisfied). 84 Fed. Reg. at 15772. In its final form, CMS stuck with its rule as proposed. *See id.* That decision now causes substantial injury to Florida Blue.

12.    Florida Blue now challenges the Extreme Circumstances Rule as, in material part, arbitrary and capricious, both on its face and specifically in relation to Florida Blue's Star Ratings for the 2025 benefit year, as a result of CMS—relying on the arbitrary aspects of that rule— arbitrarily denying Florida Blue an adjustment following severe emergency flooding-related disruptions in Broward County, Florida.

13.    Specifically, in April 2023, Broward County experienced historic flooding that caused major disruptions that impaired Florida Blue's ability to coordinate care for its members and its members receipt of care in that county. Thunderstorms dropped torrential rainfall over Fort

5

Lauderdale and other parts of Broward County, dumping more than two feet of rain on April 12 alone. At one point, Fort Lauderdale city officials had to use airboats and high-clearance buggies to rescue people and pets trapped inside homes by the floodwaters. The County endured flooding for four days. Storms of this magnitude have an average recurrence interval ("ARI") of once every 200 years.

14.     Following the flooding, Florida Governor Ron DeSantis declared a state of emergency. Fifteen days later, President Joe Biden declared Broward County a major disaster area pursuant to the Stafford Act. FEMA also announced that federal disaster assistance would be available to affected individuals in Broward County.

15.     When natural disasters like this occur, the Secretary may declare a PHE under Section 319 of the Public Health Services Act, 42 U.S.C. § 247d.

16.     Furthermore, if the President declares a major disaster or emergency under the Stafford Act and the Secretary declares a PHE, the Secretary is empowered to take additional steps to help affected health care providers by issuing a waiver pursuant to Section 1135(b) of the Social Security Act (an "1135 waiver")—the purpose of an 1135 waiver in this context is to excuse certain administrative requirements in order to increase access to medical services during a time of emergency..

17.     Despite the extraordinarily rare rainfall event in Broward County in April 2023— and disaster and emergency declarations from both Governor DeSantis and President Biden—the Secretary did not declare a PHE or, consequently, issue an 1135 waiver.

18.     Florida Blue offers multiple Medicare plans to a significant number of members in Broward County, including, under Part C, a Medicare Advantage Health Maintenance Organization plan (contract H1035, referred to here as the "HMO Plan") and a Medicare

Advantage Local Preferred Provider Organization plan (contract H5434, referred to in this Complaint as the "LPPO Plan"), and, under Part D, a Prescription Drug Plan (contract S5904, referred to in this Complaint as the "PDP"). In 2023, these Medicare plans serviced thousands of members in Broward County. The members of these plans—in particular, the members of the HMO Plan and the PDP—experienced significant disruption to health care services from the flooding in Broward County. As a result of these flood-caused impacts, the 2025 Star Ratings of the HMO Plan and PDP were adversely affected.

19.    The impacts of the April 2023 flooding in Broward County on Florida Blue's Medicare plans are material to those plans' 2025 Star Ratings when viewed in combination with a second significant weather event that hit Broward County in 2023. Specifically, several months after the historic flooding in Broward County, in August 2023, a large swath of Florida—including Broward County—was struck by Hurricane Idalia. In that latter instance, the President declared a disaster for which FEMA provided relief, and the Secretary declared a public health emergency and issued appropriate waivers under Section 1135. The cumulative impacts of the April 2023 flooding and Hurricane Idalia on Florida Blue's Medicare plans in Broward County would have triggered an adjustment for Florida Blue's HMO Plan and PDP under the Extreme Circumstances Rule. But because Secretary Becerra did not declare a public health emergency or issue an 1135 waiver for the Broward County flooding, Florida Blue's HMO Plan and PDP did not receive "extreme and uncontrollable circumstances" adjustments to their 2025 Star Ratings under the Extreme Circumstances Rule, which in turn resulted in those plans receiving lower 2025 Star Ratings than they otherwise would have received had they been given the benefit of that adjustment.

20.     Florida Blue's lower ratings negatively impact its revenue and its ability to serve its members. Specifically, the lower ratings will cause Florida Blue to lose tens of millions of dollars—money it would otherwise be able to put toward greater member benefits.

21.     The Star Ratings are designed to create a level playing field by which Medicare beneficiaries can compare the quality of services Medicare plans provide. These ratings are supposed to be based on objective criteria that measures a plan's performance. Whether the Secretary issues a PHE in response to a natural disaster is discretionary—that decision has no necessary correlation to the impacts of a significant weather event. Indeed, two or more counties may experience substantially similar disasters, with largely identical impacts on the health plans operating in the respective service areas, and yet the Secretary may declare a PHE in one but not all similarly impacted areas. Because a PHE is a statutory prerequisite to an 1135 waiver, and an 1135 waiver in turn is a regulatory prerequisite to a Star Ratings adjustment under the Extreme Circumstances Rule, only plans in the area for which a PHE was declared have a chance at qualifying for a Star Ratings adjustment.

22.     In contrast to the Extreme Circumstances Rule, CMS utilizes a less stringent standard to impose "special requirements during a disaster or emergency" on Medicare Advantage plans to make operational changes and waive certain plan provisions when an emergency or disaster disrupts access to health care. Under that separate rule, CMS requires only one disaster- or emergency-related declaration to trigger plan operational changes: when the President declares a disaster or emergency, *or* the Secretary declares a public health emergency, *or* the affected jurisdiction's governor declares an emergency or disaster. *See* 42 C.F.R. § 422.100(m).

23.     CMS's Extreme Circumstances Rule is arbitrary and capricious, both on its face and as applied in this instance to Florida Blue. It is self-defeating, inconsistent with CMS's

separate rule described in the preceding paragraph, and ultimately results in similarly situated health plans receiving dissimilar regulatory treatment from CMS.

24.     Because, if left uncorrected, CMS's arbitrary actions will cause Florida Blue substantial reputational and economic harm, Florida Blue files this Complaint for relief.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 because this action arises under the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq.*, and raises questions under 42 U.S.C. § 1395 *et seq.*

26.     The promulgation of the Exceptional Circumstances Rule constitutes final agency action.

27.     CMS's announcement of the 2025 Star Ratings on October 10, 2024, was also final agency action.

28.     Florida Blue has standing because it is an MAO and Part D sponsor, and its Medicare plans are scored under the Star Ratings program. The 2025 Star Ratings announced by CMS resulted in lower ratings for Florida Blue's HMO Plan and PDP, in turn resulting in both reputational and substantial economic injury to Florida Blue.

29.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because this is an action against officers and agencies of the United States and a substantial part of the events giving rise to Florida Blue's claims occurred in this District.

30.     This Complaint is timely under 28 U.S.C. § 2401(a).

## PARTIES

31.     Plaintiff Blue Cross and Blue Shield of Florida, Inc. (d/b/a Florida Blue) is a Florida corporation. Blue Cross and Blue Shield of Florida, Inc.'s (d/b/a Florida Blue) principal place of

business is in Jacksonville, Florida, and it is an independent licensee of the Blue Cross and Blue Shield Association. Florida Blue offers the LPPO (contract H5434) under Medicare Part C and the PDP (contract S5904) under Medicare Part D.

32.    Plaintiff Florida Blue Medicare, Inc. (d/b/a Florida Blue Medicare) is a Florida corporation. Its principal place of business is in Jacksonville, Florida. Florida Blue Medicare, Inc. (d/b/a Florida Blue Medicare) is an affiliate of Plaintiff Blue Cross and Blue Shield of Florida, Inc. (d/b/a Florida Blue). Florida Blue Medicare offers the HMO Plan (contract H1035) under Medicare Part C.

33.    Blue Cross and Blue Shield of Florida, Inc. (d/b/a Florida Blue) and Florida Blue Medicare, Inc. (d/b/a Florida Blue Medicare) provide a full spectrum of health care plans and services to millions of members, many of whom are Medicare beneficiaries.

34.    Defendant HHS is the department of the federal government that is ultimately responsible for the federal Medicare and Medicaid programs.

35.    HHS has delegated its authority to administer the Medicare and Medicaid programs to CMS. *See* 66 Fed. Reg. 35437 (June 29, 2001).

36.    Defendant CMS is a federal agency within HHS that is primarily responsible for overseeing the Medicare program and the federal portion of the Medicaid program. It was created by the Reorganization Act of March 9, 1977. *See id.*

37.    Defendant Xavier Becerra is named in his official capacity as the Secretary of HHS. *See* 42 C.F.R. § 405.1136(d)(1).

38.    Defendant Chiquita Brooks-LaSure is named in her official capacity as Administrator of CMS. The CMS Administrator is responsible for the administration of the Medicare program, including the Star Ratings for Medicare Advantage plans. *Id.*

## STATUTORY AND REGULATORY BACKGROUND

### The Medicare Program

39.     Medicare is a federal program that provides health insurance benefits for Americans aged 65 years and older and certain disabled persons. *See* 42 U.S.C. § 1395 *et seq.*

40.     CMS is the federal agency responsible for administering the Medicare program.

41.     Medicare is divided into different parts to cover various aspects of healthcare. Part A covers inpatient hospital stays, skilled nursing facilities, hospice care, and some home health care. Part B covers outpatient care, doctor visits, preventative services, some home health care, and durable medical equipment. 42 U.S.C. §§ 1395c to 1395i-6 (Part A); 42 U.S.C. §§ 1395j to 1395w-6 (Part B). Under Medicare Parts A and B—traditional or "original" Medicare—the federal government acts as the insurer and directly pays providers for each service rendered to Medicare beneficiaries.

42.     In 1997, through the Balanced Budget Act, Congress created Medicare Part C, which in 2003 became known as Medicare Advantage. 42 U.S.C. § 1395w-21. Medicare Advantage allows individuals to receive Medicare benefits through private insurance plans that contract with the federal government. The Medicare Advantage program is intended to shift the financial risk of providing health care for Medicare beneficiaries from the federal government to privately run plans in exchange for a per-member, per-month payment.

43.     The Medicare Advantage plan must provide members at least the same level of benefits offered by traditional Medicare. Medicare Advantage plans combine coverage from both Parts A and B and are often offered with prescription drug coverage under Medicare Part D, which was introduced in 2003 as part of the Medicare Prescription Drug, Improvement, and

Modernization Act of 2003 ("MMA"), Pub. L. No. 108-173, 117 Stat. 2066 (2003), specifically to provide prescription drug benefits. 42 U.S.C. § 1395 *et seq.*

44.     Through the 2003 MMA, Congress overhauled Medicare and significantly altered the way Medicare Advantage plans are paid. The MMA set the minimum payment for private plans to at least as high as traditional Medicare spending per enrollee. These payments are paid on a pre-determined monthly sum for each Medicare beneficiary. *Id.* § 1395w-23. The MMA also established a bidding process, whereby plans submit a bid representing the estimated cost for a Medicare Advantage plan to provide basic Medicare benefits to members for the coming year, including administrative overhead and profit. *See id.* § 1395w-23(a)(1)(B). If the plan's bid is lower than the county-level benchmark set by CMS based on traditional Medicare spending per enrollee, CMS returns a portion of the savings to the plans as a "rebate," which the plan can use to fund additional benefits or reduce premiums. *See id.* § 1395w-23(a)(1)(E).

**Star Ratings and Their Financial Impact to Medicare Advantage Plans**

45.     Medicare Star Ratings are a key component of the Medicare program, designed to measure the quality of care provided by Medicare Advantage plans and PDPs. Even before the Star Ratings system as we know it today, Medicare Advantage plans were required to "have arrangements . . . for an ongoing quality assurance program." *Id.* § 1395w-22(e)(1). CMS has published raw data about plan quality and performance since 1998. *See* 83 Fed. Reg. at 16520. Reported plan data include performance measures from the Healthcare Effectiveness Data and Information Set ("HEDIS") and Consumer Assessment of Healthcare Providers and Systems ("CAHPS") surveys. *See* 69 Fed. Reg. 46866, 46886 (Aug. 3, 2004).

46.     In 2007, CMS officially introduced the Medicare Star Ratings system. CMS develops and publicly posts a five-star rating system for Medicare plans as part of its responsibility

to disseminate comparative information, including information about quality, to Medicare beneficiaries under sections 1851(d) and 1860D–1(c) of the Social Security Act and based on the collection of different types of quality data under section 1852(e). 42 U.S.C. §§ 1395w-21(d), 1395w-101(c), and 1395w-22(e).

47.    Star Ratings are based on a five-star scale, set in half-star increments, where one star is the lowest rating, and five stars is the highest rating. *See* 42 C.F.R. §§ 422.162(b), 422.166(h)(1)(ii), 423.182(b), 423.186(h)(1)(ii).

48.    Star Ratings are designed to accurately reflect a "plan's quality" and are supposed to be based on data that are "complete, accurate, reliable, and valid." 83 Fed. Reg. at 16521.

49.    The Star Ratings are based on the scores plans earn on various quality and performance "measure[s]." *See* 42 C.F.R. §§ 422.162(a), 423.182(a). For example, for 2025 Star Ratings, Medicare prescription drug plans are rated on approximately 40 unique quality and performance measures applicable to plans under both Part C (MA-PDs) and Part D (PDPs), whereas Medicare Advantage-only contracts are rated on approximately 30 Part C measures. *See* 42 U.S.C. § 1395w–23(o); *see also id.* § 1395w–22(e).

50.    To calculate a Medicare plan's overall Star Rating, each measure receives a measure-specific numerical score based on an analysis of the data identified by CMS for that measure. CMS then converts that numerical score into a measure-specific Star Rating on a five-star scale by determining "cut points" to separate each contract into the whole star increments. 42 C.F.R. §§ 422.166(a)(4), 423.186(a)(4). Measure-level Star Ratings involve the use of various data sources, which have their own rounding rules. In addition, the measure scores for all contracts involve the conversion of granular data across the industry into cut points, so even minor data changes can result in movements in the cut points which in turn can lead to significant changes in

a Medicare plan's measure-specific Star Ratings. Because those measure-specific Star Ratings are then used on a weighted basis to calculate the overall Star Rating, small changes in the cut points can profoundly impact a plan's overall Star Rating.

51.    CMS prominently displays Star Ratings in online and print resources available to Medicare plans, as required under the Social Security Act. *See* 42 U.S.C. § 1395w-21.

52.    Medicare beneficiaries may also widely access Star Ratings information when deciding which Medicare plans to enroll in. The measures are intended by CMS to aid Medicare beneficiaries in comparing the quality of health plans.

53.    Prospective Medicare plan members may view the ratings online in the Medicare Plan Finder. This tool displays all Medicare plans available for enrollment to a Medicare beneficiary, and it ranks the plans from highest to lowest by their Star Ratings. Therefore, Star Ratings have tremendous value to Medicare plans.

54.    Initially, the primary purpose of Star Ratings was to inform Medicare beneficiaries about quality when choosing a plan, and to help CMS identify low performing plans for compliance actions. *See* 75 Fed. Reg. 71190, 71219 (Nov. 22, 2010). In 2010, the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010), introduced the Quality Bonus Payment program, which incorporated Star Ratings into two statutory formulas to be used in determining certain payments to Medicare Advantage plans. *See* 42 C.F.R. §§ 422.160(b)(2), 423.180(b)(2); 75 Fed. Reg. at 71218. The first, codified at 42 U.S.C. § 1395w-23(o), rewards Medicare Advantage plans rated four stars or higher with an increased benchmark against which to bid. The second, codified at 42 U.S.C. § 1395w-24(b)(1)(C), gives higher-rated plans a larger portion of the difference between their bid and their benchmark back as a rebate.

55. The ACA provides that a Medicare Advantage plan is entitled to a Quality Bonus Payment from CMS depending on the "quality rating" of the plan, which "shall be determined according to a 5-star rating system." 42 U.S.C. § 1395w-23(e)(4)(A).

56. In accordance with Section 1854(b)(1)(C)(v) of the Social Security Act, when Medicare Advantage plans project expenses below a CMS determined benchmark, a portion of the savings is returned to the plan for use in Medicare beneficiaries' supplemental benefits (a "rebate"). Through the Quality Bonus Payment, the amount of rebate dollars paid will vary based on Star Rating: plans at or above 4.5 stars retain 70 percent of the difference as rebate dollars; plans at 3.5 or 4 stars retain 65 percent; and plans at or below 3 stars retain only 50 percent.

57. Furthermore, Star Ratings can impact plan payment by making more funds available to spend on supplemental benefits for enrollees. If a Medicare Advantage plan receives a Star Rating of four stars or higher, its benchmark amount is increased, in turn increasing the rebates that CMS will pay by increasing the difference between the plan sponsor's benchmark and its bid. 42 U.S.C. § 1395w-23(o)(1), (3)(A).

58. As is evident, a higher-rated plan will retain more rebate dollars and can therefore provide more supplemental benefits or lower premiums to its enrollees. These Quality Bonus Payments are therefore critical for Medicare Advantage plans, as they serve as both a financial incentive for delivery of high-quality care to enrollees and a strategic tool to enhance competitiveness in the marketplace. For example, plans may, but are not required to, use the Quality Bonus Payments to offer enhanced benefits that are not covered by traditional Medicare, such as dental, vision, and hearing. If a plan otherwise wanted to enhance benefits it would have to find an actuarial offset either in reducing other supplemental benefits or charging more. Plans can also the use payments to lower premiums, co-payments, or deductibles. The cost of premiums

and co-payments is usually a significant factor for beneficiaries when selecting a plan, and lower costs can therefore give a plan a distinct edge in the market.

59.    A Medicare plan's Star Rating in one year will thus affect its revenue for the following year and its CMS contract bidding strategy. Star Ratings translate into higher quality bonuses, which can supplement the plan's overall revenue. A plan's Star Rating and corresponding bonus payment will impact market competitiveness, as the additional funding may allow the plan to offer lower premiums and richer benefits which could attract members.

60.    To set the 2025 Star Rating, CMS began with 2023 data as the measurement period. Then, in 2024, CMS analyzed the performance data and then released the final Star Ratings in October. The Quality Bonus Payments are finalized by mid-April 2025. In 2026, plans receive those Quality Bonus Payments, in the form of a higher benchmark and greater percentage of rebate allowance, based on their assigned rating from the prior year. For ease of reference, the following represents the sequence of events involved in the Star Ratings evaluation cycle.



61.     Finally, if a Medicare plan consistently receives Star Ratings below three stars, it may be terminated from the Medicare program. *See* 42 C.F.R. §§ 422.510(a)(4)(xi), 423.509(a)(4)(x).

## **Adjustments to Star Ratings Based on "Extreme and Uncontrollable Circumstances"**

62.     Natural disasters and other extreme weather events can negatively impact health plans' ability to coordinate their members' health care and provide benefits to their members. In a 2019 rulemaking, CMS promulgated the Extreme Circumstances Rule to account for these events when calculating a Medicare plan's Star Ratings. The rule operates against the background of certain statutory authorities directing how the federal government may respond to disasters and emergencies.

63.     The President of the United States is authorized to declare a "major disaster" or "emergency" pursuant to the Stafford Act (42 U.S.C. §§ 5121-5207) and the National Emergencies Act (50 U.S.C. §§ 1601 *et seq.*). An "emergency" is defined in the Stafford Act as "any occasion or instance for which, in the determination of the President, Federal assistance is needed to supplement State and local efforts and capabilities to save lives and to protect property and public health and safety, or to lessen or avert the threat of a catastrophe in any part of the United States." 42 U.S.C. § 5122(1).

64.     A "major disaster" is defined in the Stafford Act as "any natural catastrophe (including any hurricane, tornado, storm, high water, wind-driven water, tidal wave, tsunami, earthquake, volcanic eruption, landslide, mudslide, snowstorm, or drought), or, regardless of cause, any fire, flood, or explosion, in any part of the United States, which in the determination of the President causes damage of sufficient severity and magnitude to warrant major disaster assistance under this chapter to supplement the efforts and available resources of States, local

governments, and disaster relief organizations in alleviating the damage, loss, hardship, or suffering caused thereby." 42 U.S.C. § 5122(2).

65.    When a presidential declaration is issued under the Stafford Act, FEMA is delegated responsibility to oversee or provide federal assistance. Exec. Order No. 12673: Delegation of Disaster Relief and Emergency Assistance Functions, 54 Fed. Reg. 12571 (Mar. 23, 1989). Pursuant to that authority, FEMA has promulgated regulations for coordinating assistance between federal and state officials and establishing procedures and eligibility qualifications for receiving federal disaster funding. 44 C.F.R. §§ 206.1 *et seq.*

66.    Under Section 319 of the Public Health Service Act ("PHSA"), the Secretary may declare a PHE when the Secretary determines "a disease or disorder presents a public health emergency; or . . . a public health emergency, including significant outbreaks of infectious diseases or bioterrorist attacks, otherwise exists . . . ." 42 U.S.C. § 247d(a). The Secretary's authority under Section 319 is distinct from and independent of the President's disaster and emergency declaration authorities. When issuing a PHE, the Secretary does not provide a supporting rationale; rather, the Secretary issues a shortly worded declaration that says "pursuant to the authority vested in me under section 319 of the Public Health Service Act, [I] do hereby determine that a public health emergency exists[.]"[1] A PHE remains in effect until the Secretary determines "that the emergency no longer exists" or 90 days from the issuance of the PHE, which occurs first. 42 U.S.C. § 247d(a)(2).

67.    When the President declares a major disaster or emergency under the Stafford Act or National Emergencies Act, ***and*** the Secretary declares a PHE under Section 319 of the Public Service Health Act, the Secretary is further authorized by Section 1135 of the Social Security Act

---

[1] https://aspr.hhs.gov/legal/PHE/Pages/default.aspx.

18

to waive certain Medicare requirements during national emergencies. 42 U.S.C. § 1320b-5(b); *see Alliance v. Becerra*, 2024 WL 4006049, at *2 (D.D.C. Aug. 30, 2024). Specifically, under Section 1135, the Secretary may temporarily waive or modify certain Medicare requirements to ensure: (1) sufficient health care items and services are available to meet the needs of individuals enrolled in Social Security Act programs in the emergency area and time periods; and (2) providers who give such services in good faith can be reimbursed and exempted from sanctions for noncompliance. 42 U.S.C. § 1320b-5(a). Section 1135 waivers typically end no later than the termination of the emergency period, or 60 days from the date the waiver or modification is first published unless the Secretary extends the waiver by notice for additional periods of up to 60 days, up to the end of the emergency period.

68.    Extreme and uncontrollable circumstances, such as natural disasters, can directly affect Medicare beneficiaries and providers, as well as Medicare plans that coordinate medical care and provide prescription drug coverage. The 2019 Extreme Circumstances Rule adopted by CMS purported to address such circumstances and provide a greater measure of equity to the Star Ratings program. As CMS characterized it, the intent of the rule is to avoid penalizing plans for circumstances that "may negatively affect the underlying operational and clinical systems that CMS relies on for accurate performance measurement in the Star Ratings program, all without fault on the part of the MA organization or Part D sponsor." 84 Fed. Reg. at 15770 (final rule); 83 Fed. Reg. at 55025 (proposed rule); *cf. AvMed, Inc. v. Becerra*, 2021 WL 2209406, at *15 (D.D.C. June 1, 2021) ("[B]ecause Star Ratings are a curved grading system, it makes sense to protect against ratings declines for plans uniquely harmed by a localized emergency. Otherwise, plans in affected areas would be disadvantaged in their ratings relative to plans in unaffected areas.").

69.     As adopted, the rule reads as follows:

(i) *Extreme and uncontrollable circumstances*. In the event of extreme and uncontrollable circumstances that may negatively impact operational and clinical systems and contracts' abilities to conduct surveys needed for accurate performance measurement, CMS calculates the Star Ratings as specified in paragraphs (i)(2) through (10) of this section for each contract that is an affected contract during the performance period for the applicable measures. We use the start date of the incident period to determine which year of Star Ratings could be affected, regardless of whether the incident period lasts until another calendar year.

(1) *Identification of affected contracts*. A contract that meets all of the following criteria is an affected contract:

(i) The contract's service area is within an ''emergency area'' during an ''emergency period'' as defined in section 1135(g) of the Social Security Act.

(ii) The contract's service area is within a county, parish, U.S. territory or tribal area designated in a major disaster declaration under the Stafford Act and the Secretary exercised authority under section 1135 of the Social Security Act based on the same triggering event(s).

(iii) As specified in paragraphs (i)(2) through (10) of this section, a certain minimum percentage (25 percent or 60 percent) of the enrollees under the contract must reside in a Federal Emergency Management Agency (FEMA)-designated Individual Assistance area at the time of the extreme and uncontrollable circumstance.

\*       \*       \*

42 C.F.R. §§ 422.166(i), 423.186(i).

70.     A FEMA-designated Individual Assistance area, as referred to in criteria (iii), is a geographic area in which FEMA administers federal assistance, as authorized by the Stafford Act and delegated to FEMA from the President via executive order.

71.     Thus, under the Extreme Circumstances Rule, it is not enough that a health plan suffers impacts from an emergency for which the President has issued a disaster declaration and FEMA is providing federal disaster relief. Rather, an affected plan can only obtain an equitable

adjustment to its Star Rating *if*, for that same emergency, the Secretary also declares a PHE, a discretionary act that may be informed by any number of unknowable factors—including policy, political, or purely awareness-based factors—that do not have any direct relationship or relevance to the actual impacts of the underlying "localized emergency" on a Medicare plan's operations or services..

72.    This point was not lost during the rulemaking. At least one commenter pointed out during the comment period that the rule should apply if a certain minimum percentage of the plan's members reside in an emergency area for which FEMA is providing assistance (*i.e.*, that the third criterion is satisfied). *See* 84 Fed. Reg. at 15772. Specifically, that commenter stated:

> Our findings also suggest that the impact of such extreme and uncontrollable circumstances may be highly concentrated to certain zip codes or counties, and may not rise to the level of a state-level state of emergency. We are unclear on whether criteria #s 1 and 2 require a state-level declaration of emergency to qualify selected geographies and contracts as eligible for adjustment. If so, this may be too restrictive. Rather, we find that criteria #3 (minimum percentage of enrollees residing in a FEMA-designated Individual Assistance Area) is most applicable to accurately identify the impact of an uncontrollable event.[2]

73.    CMS disagreed with the commenter and adopted its rule as proposed. In rejecting the logic of the comment, it stated that meeting the three criteria in the rule "ensures the extreme and uncontrollable circumstances policy is limited to contracts that may have experienced a real impact from the disaster in terms of operations or ability to serve enrollees. It also ensures that it applies only when the event is extreme, meriting the use of special adjustments to the Star Ratings." 84 Fed. Reg. at 15772. CMS did not attempt to explain why its stated objective of limiting the

---

[2] Policy and Technical Changes to the Medicare Advantage, Medicare Prescription Drug Benefit, and Medicaid Managed Care Programs for Contract Year 2020 CMS-4185-P, CMS-2018-0133, Comments Letter from RxAnte, at 2-3 (Dec. 21, 2018), *available at* https://www.regulations.gov/docket/CMS-2018-0133.

adjustment policy "to contracts that may have experienced a real impact from the disaster in terms of operations or ability to serve enrollees" was not already presumptively demonstrated by plans demonstrating that the minimum percentage of their members resided in a FEMA-designated Individual Assistance area.

74.     There is a close correlation between the Secretary issuing a PHE under the PHSA and also issuing corresponding waivers under Section 1135 of the Social Security Act. In FY 2023, the Secretary declared five PHEs on account of severe storms, wildfires, and the like, and the Secretary issued 1135 waivers for all five disaster events. *Compare* List of Declarations of a Public Health Emergency[3] (identifying five storm/wildfire-related PHEs: (1) Mississippi–Severe Storms, Straight-Line Winds, and Tornadoes (Mar. 27, 2023); (2) Guam–Typhoon (June 2, 2023); (3) Hawaii–Wildfires (Aug. 11, 2023); (4) Florida–Hurricane (Aug. 30, 2023); and (5) Georgia–Hurricane (Sept. 12, 2023)) *with* CMS 2025 Advance Notice (noting HHS issued 1135 waivers for all 2023 PHEs). Similarly, in 2022, the Secretary issued 1135 waivers at the same rate—five 1135 waivers for all five PHEs. *Compare* List of Declarations of a Public Health Emergency[4] (identifying five storm/wildfire-related PHEs: (1) New Mexico–Wildfires and Straight-Line Winds (May 9, 2022); (2) Kentucky–Severe Storms, Flooding, Landslides, and Mudslides (Aug. 2, 2022); (3) Puerto Rico–Hurricane (Sept. 20, 2022); (4) Florida–Hurricane (Sept. 26, 2022); and (5) South Carolina–Hurricane (Sept. 30, 2022)) *with* CMS 2024 Advance Notice (noting HHS issued 1135 waivers for all 2022 PHEs).

75.     There is not, however, a strong correlation between presidential emergency declarations and secretarial PHEs. For example, for FY 2023, while President Biden announced

---

[3] https://aspr.hhs.gov/legal/PHE/Pages/default.aspx.

[4] https://aspr.hhs.gov/legal/PHE/Pages/default.aspx.

major disaster declarations in approximately 50 instances, involving severe storms, hurricanes, and flooding in multiple states across the nation, such as Maine, Vermont, Arkansas, Tennessee, Nevada, and California,[5] the Secretary declared a PHE with a corresponding 1135 waiver for only *three* of these President-designated major disasters (severe storms in Mississippi, March 27, 2023; Hurricane Idalia in Florida, August 30, 2023; and Hurricane Idalia in Georgia, September 12, 2023).[6]

76.     Thus, even though natural disasters occur that cause, among other things, severe disruption to health plans, the Secretary does not reliably issue PHEs even though the "localized emergency"—as evidenced by a presidential disaster declaration and FEMA disaster relief—can be every bit as severe and disruptive to health plans as are those events for which the Secretary does issue a PHE.

## FACTUAL ALLEGATIONS

77.     From April 12 to April 14, 2023, a deluge of rain poured down on Broward County, Florida, leaving buildings flooded, commuters stranded in their vehicles, emergency personnel stretched thin, and streets with enough standing water for residents to swim in.[7] The storm was so powerful and unique that it showed an ARI of more than 200, making it a "once in every 200 years" event, or a statistical likelihood of less than 0.5% that it could happen in any given year. The severity of the emergency was immediately recognized on a local and national level. A year later, in April 2024, Broward County was still at work on rehabilitation efforts.

---

[5] https://www.fema.gov/disaster/declarations (Keywords "Severe Storm" and "2023").

[6] https://aspr.hhs.gov/legal/PHE/Pages/default.aspx.

[7] https://www.sun-sentinel.com/2023/04/12/fort-lauderdale-drenched-with-over-20-inches-of-rain-life-threatening-flash-flood-emergency-extended/.

**The Historic Storm Dropped More Than Two Feet of Rain in a Single Day**

78.    By April 11, 2023, the National Weather Service and other meteorologists saw signs of heavy rainstorms building over much of southeastern Florida. At 11:15 a.m. that day, the National Weather Service issued a flood watch to Broward and Miami-Dade Counties.[8]

79.    Overnight and into the following morning, numerous thunderstorms developed ahead of a warm front, increasing the risk of extreme flooding. The National Weather Service issued additional warnings of the increased flood threat.

80.    By midday on April 12, 2023, heavy rainfall was recorded at three to five inches within a two-hour window. The National Weather Service issued two flash flood warnings, including one in Broward County at 2:39 p.m.

81.    By mid-afternoon, the storm had formed into slow-moving supercells. The storm's slow speed exacerbated its impact. By 3:37 p.m., rainfall increased to two to three inches per hour. The National Weather Service issued a "considerable-tagged" flash flood warning for the Broward County/Fort Lauderdale area. A "considerable" tag indicates that the storm is of unusual severity and urgent action is needed.[9]

82.    Around 3:30 p.m., the National Weather Service issued a tornado warning after observing on the radar a supercell moving toward the Fort Lauderdale area that showed potential to develop into a tornado.

83.    Broward County saw rainfall of nearly 12 inches in only three hours from 3 p.m. to 6 p.m. Within the six-hour period of 4 p.m. to 10 p.m., 20 inches of rain fell in the same area. By midnight on April 12, rainfall totaled nearly 26 inches, as measured at Fort Lauderdale-Hollywood

---

[8] https://storymaps.arcgis.com/stories/.
[9] https://www.weather.gov/arx/FFWEA.

International Airport. This significantly surpassed the 44-year record of 14.59 inches set on April 25, 1979, at the same location. Images like the following capture the hardship caused by the flooding:



*Joe Cavaretta, South Florida Sun Sentinel via WUSF/NPR*[10]

84.     Additionally, two EF-0 tornados struck Broward County on April 12. The tornado that struck Dania Beach caused significant damage to a mobile home park, ripping off roofs of homes.

85.     The Broward County Sheriff's Office was so overwhelmed that it asked residents to only call 911 in cases of "true emergencies."[11]

86.     Predictably, the heavy rainfall led to extensive flooding and damage: Fort

---

[10] https://www.wusf.org/weather/2023-04-14/photos-historic-downpour-floods-broward.

[11] https://www.cbsnews.com/miami/news/deluge-2023-remembering-fort-lauderdales-historic-flooding-1-year-later/.

Lauderdale-Hollywood International Airport was forced to close for two days; flooded roads were full of abandoned or stuck vehicles; power outages were extensive; homes, businesses, and schools were inundated. Even a Broward Sheriff's Fire Rescue station flooded, forcing first responders to evacuate.

87.     Residual flooding lasted for several days. Restoration and rebuilding efforts continued in many parts of Broward County for more than a year after the historic April 12 rains.

### Local and Federal Acknowledgment of the Disastrous Impact

88.     On April 13, 2023, Florida Governor Ron DeSantis issued Executive Order 23-65 (Emergency Management – Broward County Flooding), declaring a state of emergency in Broward County because of the "severe and heavy rainfall of over 25 inches, and consequential flooding" and the resulting "impact [on] the operational capability of critical infrastructure, including major state and county roadways, airports, hospitals, schools, and other critical infrastructure throughout Broward County[.]"[12] Governor DeSantis directed state agencies to expend available funds and additional funds from the Emergency Preparedness and Response Fund in addressing the Broward County flooding crisis.

89.     On April 25, 2023, Governor DeSantis wrote a letter to President Biden, requesting that the President issue a Major Disaster Declaration under the Stafford Act for the State of Florida due to the significant flooding in Broward County. The Governor's request emphasized the widespread damage to Broward County infrastructure and estimated that damages to the area,

---

[12] Florida Executive Order 23-65 at 1 (Apr. 13, 2023), https://www.flgov.com/eog/sites/default/files/executive-orders/2024/EO-23-65-1.pdf.

including hard-hit Fort Lauderdale, would exceed $100 million.[13] U.S. Senators Marcio Rubio and Rick Scott both wrote to President Biden in support of Governor DeSantis' request, urging maximum access to federal resources for Broward County given the "historic flooding" and its substantial impact on homes, businesses, and transportation arteries.[14] Congressman Jared Moskowitz likewise petitioned President Biden to approve the federal disaster declaration.[15]

90.    On April 27, 2023, President Biden declared Broward County a Major Disaster and ordered the availability of federal funding and assistance to all areas "affected by severe storms, tornadoes, and flooding from April 12 to April 14, 2023."[16] That same day, FEMA issued a Preliminary Damage Assessment Report, summarizing the severe damage to Broward County and the need for individual and public assistance.[17] FEMA accepted disaster assistance applications from impacted individuals from April 29, 2023, until June 27, 2023.[18]

---

[13] Governor DeSantis Letter to President Biden (Apr. 25, 2023), https://www.floridadisaster.org/contentassets/241a13fe015142f2998c308d5a3c3aa8/major-disaster-dec-request-broward-county-flooding-executed.pdf

[14] Senators Rubio, Scott Support Letter to President Biden (Apr. 15, 2023), https://www.rubio.senate.gov/wp-content/uploads/rubio-scott-to-president-re-broward-floods-major-disaster-designation-request.pdf.

[15] https://thehill.com/homenews/state-watch/3966674-florida-rep-calls-on-biden-to-approve-disaster-declaration-after-historic-flooding/.

[16] White House Announcement (Apr. 28, 2023), https://www.whitehouse.gov/briefing-room/presidential-actions/2023/04/28/president-joseph-r-biden-jr-approves-florida-disaster-declaration-3/.

[17] FEMA-DR-4709-FL Initial Notice (Apr. 27, 2023), https://www.fema.gov/disaster-federal-register-notice/4709-dr-fl-initial-notice.

[18] FEMA Announcement (Apr. 29, 2023), https://www.fema.gov/press-release/20230429/broward-county-residents-can-apply-fema-assistance.

91.     In light of the federal major disaster declaration and in recognition of the severe disruptions brought by the historic flooding, the Internal Revenue Service ("IRS") postponed certain tax-filing and payment deadlines for impacted individuals in Broward County.[19]

**Florida Blue's Star Ratings Were Adversely Impacted by the CMS Rule**

92.     Despite the President and federal agencies acknowledging the widespread disaster, HHS did not declare a PHE in Broward County. That lack of PHE, in turn, meant that the Secretary could not issue 1135 waivers for healthcare providers impacted by the historic Broward County flooding, including Florida Blue. Thus, despite the extreme and uncontrollable circumstances, all of the conditions of CMS's Extreme Circumstances Rule were not met.

93.     On January 31, 2024, CMS issued its 2025 Advance Notice, in which it identified all 1135 waivers issued for extreme and uncontrollable circumstances in FY 2023 for which adjustments would be made to the Star Ratings for impacted Medicare plans. Because no 1135 waiver had been issued, Broward County was not included on CMS's list.

94.     On March 1, 2024, Florida Blue shared its concerns in a letter to CMS regarding the omission of Broward County from the list of disaster areas in the 2025 Advance Notice. Florida Blue provided details regarding the impact of the historic flash flood event, specifically the impact to utilization rates during the week of flooding as compared to the average utilization during the seven weeks before and after flooding. Florida Blue's data showed a significant drop in office visits and prescription fills by its Medicare plan members in Broward County during the week of flooding. Given these impacts to its members' access to health care services, Florida Blue

---

[19] IRS Announcement (May 1, 2023), https://www.irs.gov/newsroom/irs-announces-tax-relief-for-victims-of-severe-storms-tornadoes-and-flooding-in-florida.

requested that CMS include the Broward County disaster in the list of disaster areas in the 2025 Advance Notice.

95.    In response to that letter, a representative of HHS met with representatives of Florida Blue to review Florida Blue's utilization data for its Medicare plans impacted by the Broward flooding. The HHS representative described the data as compelling because it shows a clear interruption to health care utilization, especially to senior beneficiaries, but because an 1135 waiver was not issued, he said essentially nothing could be done about it. HHS advised Florida Blue to contact CMS to ask for special consideration.

96.    On March 8, 2024, Florida Blue emailed CMS and again shared its concerns that the Broward County disaster was not included in the 2025 Advance Notice. Florida Blue stated that it had met with HHS, and that HHS found the data compelling.

97.    CMS responded to that communication by informing Florida Blue that its hands were tied by its Exceptional Circumstances Rule, which precludes a Star Ratings adjustment absent an 1135 waiver.

98.    On September 11, 2024, Florida Blue corresponded with CMS again, requesting that CMS re-evaluate the unique situation and consider making an exception to the Extreme Circumstances Rule. Florida Blue reiterated that the exception was necessary to ensure that its Medicare plans received accurate performance measurement ratings in the Star Ratings program, particularly since important medical care and prescription drugs for its members were impacted by the disaster.

99.    Again, CMS did not budge from its position.

100.    Three of Florida Blue's plans—its HMO Plan, PDP, and LPPO—were negatively and materially affected by the Broward County flooding. Had CMS included that emergency in its

list for purposes of adjusting for extreme and unforeseen circumstances, the Star Ratings for at least Florida Blue's HMO Plan and PDP would have been higher:

- Several months later, in August 2023, Hurricane Idalia had yet further substantial impacts on Florida Blue's HMO Plan and PDP. For that later event, the prerequisite emergency declarations were made: the President issued a declaration under the Stafford Act, the Secretary issued a PHE under the PHSA, and the Secretary issued applicable waivers under Section 1135 of the Social Security Act.

- Broward County was a FEMA-designated Individual Assistance area as a result of the April 2023 flooding and resulting presidential Stafford Act declaration. It was also a FEMA-designated Individual Assistance area after Hurricane Idalia in August 2023.

- Approximately 18% of the applicable population enrolled in Florida Blue's HMO Plan was considered impacted by Hurricane Idalia, *i.e.*, resided in the FEMA-designated Individual Assistance area. Another 8% of members were impacted by the Broward flooding.

- CMS acknowledges that when multiple extreme and uncontrollable events impact the same area within a single plan year, the affected Medicare plans may aggregate the effects of these events for purposes of applying the Extreme Circumstances Rule.

- Had both events been considered for Star Ratings adjustment purposes, the HMO Plan's total affected membership in a FEMA-designated Individual Assistance area would have been 26%.

- Similarly, approximately 22% of the applicable population enrolled in Florida Blue's PDP was considered impacted by Hurricane Idalia. Another 4% of members were impacted by the Broward flooding. Had both events been considered for Star Ratings adjustment purposes, the PDP's total affected membership in a FEMA-designated Individual Assistance area would also have been 26%.

101. In turn, had Florida Blue received the extreme and uncontrollable circumstances adjustment, its HMO Plan would have received a 4.5 Star Rating instead of a 3.5 Star Rating. Florida Blue will lose tens of millions of dollars in revenue as a result of its lower rating, in the form of a much smaller Quality Bonus Payment, in addition to the financial losses resulting from it being marketed during the 2025 open enrollment as a 3.5-star plan rather than a 4.5-star plan.

102. Similarly, if Florida Blue's PDP had received the extreme and uncontrolled circumstances adjustment, the PDP plan would have received 3.0 stars instead of 2.5 stars.

103. On November 27, 2024, Florida Blue wrote another letter to CMS, addressed to Administrator Brooks-LaSure, again asking that CMS adjust the Star Ratings for its two affected Medicare plans. By letter dated December 20, 2024, CMS declined Florida Blue's request on grounds Florida Blue did not qualify because an 1135 waiver had not been issued, such that the April 2023 Broward County flooding was "not a qualifying disaster."

**The Extreme Circumstances Rule is Arbitrary and Capricious in Material Part**

104. The Star Ratings program was designed to create a level playing field by which Medicare beneficiaries can compare the quality of services Medicare plans provide. These ratings are supposed to be based on objective criteria that measures a plan's performance for activity within the plan's control.

105. The extreme and uncontrollable circumstances adjustment is an express

acknowledgment by CMS that a Medicare plan's Star Ratings should not be adversely affected by circumstances beyond the plan's control. This includes severe weather events, which can impact a plan's ability to deliver services or meet performance targets. As CMS itself observed in adopting the challenged rule, the purpose was to avoid penalizing plans for circumstances that "may negatively affect the underlying operational and clinical systems that CMS relies on for accurate performance measurement in the Star Ratings program, all without fault on the part of the MA organization or Part D sponsor." 84 Fed. Reg. at 15770.

106.    Using CMS's own reasoning for the Extreme Circumstances Rule, the historic rainfall and flooding in Broward County is exactly the type of event for which a Star Ratings adjustment is necessary.

107.    Florida Blue's utilization data, shared with CMS and HHS over the past year, reflects substantial declines in doctor visits and prescription refills by members at the time the flooding took place in Broward County.

108.    The insistence that an 1135 Waiver be granted before permitting a Star Ratings adjustment frustrates the objectivity of the Star Ratings process by arbitrarily inserting multiple layers of subjectivity into the calculation.

109.    Take two other recent examples of where the regulatory outcome was different despite substantially similar weather events: Kentucky and Mississippi each experienced disasters in 2022 and 2023, respectively, which included, severe storms, straight-line winds, and tornadoes. In the Kentucky event, 14 to 16 inches of rainfall fell during a five-day period in July 2022, with up to four inches of rain per hour in some noncontinuous periods.[20] Mississippi suffered powerful thunderstorms and a tornado outbreak on March 24, 2023. The tornadoes caused extensive damage

---

[20] https://www.weather.gov/jkl/July2022Flooding

to homes, business, and farmland. And the thunderstorms dumped 7 to 10 inches of rain.[21] Unlike with Broward County in April 2023, the Secretary issued PHE declarations and 1135 waivers for both severe weather events.

110.    The fundamental legal flaw of the Extreme Circumstances Rule is that it leads to dissimilar treatment of substantially similar cases, which is quintessentially arbitrary and capricious. *See Grayscale Investments, LLC v. SEC*, 82 F.4th 1239, 1245 (D.C. Cir. 2023).

111.    The Extreme Circumstances Rule is also inconsistent with CMS's separate rule that imposes additional requirements on Medicare Advantage plans in the event of emergencies or disasters, as defined as *either* a presidential declaration under the Stafford Act or National Emergency Act, a secretarial declaration under the PHSA, or a governor's declaration. *See* 42 C.F.R. § 422.100(m).

112.    Florida Blue is mindful that the 2019 rule purported to create a process by which Medicare plans negatively impacted by certain events beyond their control could obtain adjustments to the calculation of their Star Ratings to ameliorate those impacts. But in choosing to take regulatory action, CMS—as with any agency—had an obligation to act in a manner that is both even handed, and predictable and rational when judged against relevant facts and the agency's stated objective. As crafted, the challenged rule is neither: CMS's rule is self-defeating, running at counter-purposes to its own stated objective for creating the rule, *i.e.*, to fairly treat plans negatively affected by circumstances and events beyond their control. The rule results in similarly situated health plans being treated differently on account of different subjective judgments of the

---

[21] https://earthobservatory.nasa.gov/images/151138/tornado-leaves-path-of-destruction-in-mississippi

Secretary that may bear little or no relation to the impacts that objectively extreme and uncontrollable events have on affected Medicare plans.

113.    Indeed, the Secretary's failure or refusal to issue a PHE for the Broward County flooding appears arbitrary and capricious in its own right, but that separate agency action or inaction need not be addressed (and Florida Blue is not by this Complaint asking the Court to address it) for this Court to find the Extreme Circumstances Rule arbitrary and capricious in material part. Indeed, it is arbitrary and capricious that CMS promulgated a rule that prevents it from treating similarly situated Medicare plans similarly based on an outside decision-maker, whose decision whether to declare a PHE need not bear any relationship to the actual impacts caused by an extreme and uncontrollable event.

114.    In other words, a "public health emergency" in the commonly understood sense may exist (as it did in Broward County in April 2023) and yet nothing compels the Secretary to declare a "Public Health Emergency" for official purposes under the PHSA. For CMS to condition a Star Ratings adjustment on that entirely subjective decision-making of a third party is arbitrary and capricious in the classic sense of those terms, as adopted into the APA.

115.    Requiring an 1135 waiver to issue, which first requires the Secretary to declare a PHE, before a plan may receive an adjustment for extreme and uncontrollable circumstances is especially arbitrary in these circumstances, where both Governor DeSantis and President Biden recognized the dire situation in Broward County qualified as an emergency, which in turn rendered the April 2023 flooding a "disaster or emergency" for purposes of CMS's separate rule that imposes additional requirements on Medicare Advantage plans in the event of emergencies or disasters. *See* 42 C.F.R. § 422.100(m). Thus, Medicare Advantage plans faced additional requirements because of the emergency, but did not benefit from a Star Ratings adjustment for the

same emergency. Moreover, Florida Blue's utilization data shows a demonstrable and material impact of the flooding in Broward County on its Medicare plans' members ability to access their benefits during the period the state and federal disaster declarations were in place.

## CLAIMS FOR RELIEF

## COUNT I

### Arbitrary and Capricious Agency Action:
### Facial Challenge to the Extreme Circumstances Rule

### (Actionable Under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A))

116. Plaintiffs incorporate the allegations set forth in Paragraphs 1 through 115 and reallege them here.

117. CMS's Extreme Circumstances Rule providing adjustments for "extreme and uncontrollable circumstances," such as severe weather events, that disrupt member services, is facially arbitrary and capricious in material part because its application is dependent on subjective and discretionary decision-making of the Secretary that needs not bear any relationship to the demonstrable impacts that extreme weather events and natural disasters actually have on Medicare plans.

118. Conditioning an equitable adjustment to a health plan's Star Rating on multiple discretionary actions by the Secretary is self-defeating because it leaves affected plans at the mercy of political or policy-based decisions without regard to the negative impacts an objectively consequential natural disaster or extreme weather event may actually cause.

119. In proposing the rule, CMS stated that its objective was to eliminate penalizing health plans for events that "may negatively affect the underlying operational and clinical systems that CMS relies on for accurate performance measurement in the Star Ratings program, all without fault on the part of the MA organization or Part D sponsor." Yet, when confronted with a comment

to the proposed rule that conditioning an adjustment on anything other than data showing that 25% or more of a plan's members were impacted by virtue of living within a presidentially declared disaster area for which FEMA was providing disaster relief, CMS insisted that the rule would require there to also exist an 1135 waiver, which by statute requires that the Secretary first declare a PHE. The Section 1135 waiver *requirement* is a non-sequitur to the stated objective of the rule. At best, a waiver could perhaps be justified as creating a presumption that an adjustment should be made; but as a necessary condition for CMS to make an adjustment, that aspect of the rule is irrational, arbitrary, and capricious.

120.    As an MAO and Part D sponsor, Florida Blue's Medicare plans are scored under the Star Ratings program, and the arbitrary aspects of the Extreme Circumstances Rule cause Florida Blue injury.

## COUNT II

### Arbitrary and Capricious Agency Action:
### As-Applied Challenge to the Extreme Circumstances Rule

### (Actionable Under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A))

121.    Plaintiffs incorporate the allegations set forth in Paragraphs 1 through 115 and reallege them here.

122.    Regardless of whether the Extreme Circumstances Rule is facially arbitrary and capricious, it is arbitrary and capricious as it relates to Florida Blue's Star Ratings for the 2025 benefit year because application of the rule to Florida Blue's Star Ratings was dependent on the subjective and discretionary decision-making of the Secretary that bore no relationship to, and did not reflect, the negative consequences to the Florida Blue plans stemming from extreme events in Broward County in April 2023 that were all outside of Florida Blue's control.

123.    The April 2023 flooding was a disaster under the CMS rule that requires Medicare Advantage plans to implement additional measures during the period of such disaster or emergency to assure access to covered benefits. *See* 42 C.F.R. § 422.100(m).

124.    Conditioning a Star Ratings adjustment for the Florida Blue plans in this instance on the issuance of an 1135 waiver is arbitrary and capricious because it is internally inconsistent with the requirements of § 422.100(m) and because it causes Florida Blue to be treated differently than similarly situated Medicare plans that qualify for a Star Ratings adjustment (for example, all plans in the service areas impacted in the disasters in Kentucky in July 2022 and Mississippi in March 2023) because the Secretary may make different choices for different geographic areas impacted by like-kind weather events or natural disasters. Both because similarly situated entities should be given similar treatment by regulators, *see Grayscale Investments*, 82 F.4th at 1245, and because the Star Ratings program is graded on a curve, *see AvMed*, 2021 WL 2209406, at *15, it is arbitrary and capricious for CMS to give the benefit of Star Ratings adjustments *only* when the Secretary makes multiple discretionary decisions that need not bear any rational relationship to, or even reflect or acknowledge, the "localized emergency" actually experienced by affected health plans. The Secretary's failure to declare a PHE or issue follow-on 1135 waivers following the April 2023 flooding in Broward County that had substantial negative impacts on Florida Blue's Medicare plans should not bear on Florida Blue's right to a Star Ratings adjustment.

125.    When CMS announced the 2025 Star Ratings on October 10, 2025, the arbitrary aspects of the Extreme Circumstances Rule caused Florida Blue injury.

## COUNT III

### Arbitrary and Capricious Agency Action:
### Challenge to the October 10, 2025, Star Ratings Release for Florida Blue's Affected Plans

### (Actionable Under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A))

126.    Plaintiffs incorporate the allegations set forth in Paragraphs 1 through 125 and reallege them here.

127.    For the reasons explained in the preceding paragraphs, the Extreme Circumstances Rule is arbitrary and capricious in material part, and it was therefore arbitrary and capricious for CMS to rely on the arbitrary aspects of that rule to assign Florida Blue's HMO Plan a Star Rating of 3.5 stars and Florida Blue's PDP a Star Rating of 2.5 stars in the agency's October 10, 2024, publication of the 2025 Star Ratings.

128.    When CMS announced the 2025 Star Ratings on October 10, 2025, it caused Florida Blue injury.

### PRAYER FOR RELIEF

The Administrative Procedure Act directs the courts to "hold unlawful and set aside agency action...found to be," *inter alia*, "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A).

WHEREFORE, Plaintiffs respectfully ask the Court to issue a judgment in their favor and:

A.    As it relates to CMS's calculation of Florida Blue's 2025 Star Ratings, sever and set aside, as arbitrary and capricious and therefore inapplicable, that portion of the Extreme Circumstances Rule that conditions Star Ratings adjustments for extreme and uncontrollable events on the existence of an "emergency area" and waiver under Section 1135 of the Social Security Act (*i.e.*, the conditions set out at 42 C.F.R. §§ 422.166(i)(1)(i) and (ii), and 423.186(i)(1)(i) and (ii));

B.  Set aside, as arbitrary and capricious, Florida Blue's 2025 Star Ratings for its HMO Plan and its PDP as announced by CMS on October 10, 2025;

C.  Order CMS to recalculate Florida Blue's 2025 Star Ratings for its HMO Plan without regard to the requirements of 42 C.F.R. §§ 422.166(i)(1)(i) or (ii);

D.  Order CMS to recalculate Florida Blue's 2025 Star Rating for its LPPO without regard to the requirements of 42 C.F.R. §§ 422.166(i)(1)(i) or (ii);

E.  Order CMS to recalculate Florida Blue's 2025 Star Rating for its PDP without regard to the requirements of 42 C.F.R. §§ 423.186(i)(1)(i) or (ii);

F.  Order CMS to use the recalculated 2025 Star Ratings for Florida Bue for purposes of calculating the associated Quality Bonus Payment for Florida Blue's HMO Plan and for all other purposes for which the 2025 Star Ratings are relevant; and

G.  Award Florida Blue any other relief the Court may deem just and proper, including costs and fees, as permitted by law.

Dated:  December 27, 2024

/s/ Daniel W. Wolff
Daniel W. Wolff (D.C. Bar #486733)
DWolff@crowell.com
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 624-2621

Stephen J. McBrady (D.C. Bar #978847)
SMcBrady@crowell.com
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 624-2547

Tiffanie McDowell (*pro have vice* forthcoming)
TMcDowell@crowell.com
CROWELL & MORING LLP
3 Park Plaza, 20th Floor
Irvine, CA 92614
Telephone: (949) 798-1328

*Plaintiffs Blue Cross and Blue Shield of Florida, Inc. (d/b/a Florida Blue) and Health Options, Inc. (d/b/a Florida Blue HMO)*