UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BLUE CROSS AND BLUE SHIELD OF
FLORIDA, INC., *et al.*,

Plaintiffs,

v.

DEPARTMENT OF HEALTH AND HUMAN
SERVICES, *et al*.,

Defendants.

Civ. A. No. 24-3609 (APM)

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT AND DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Table of Contents ............................................................................................................. i

Table of Authorities ......................................................................................................... ii

Introduction ...................................................................................................................... 1

Background ....................................................................................................................... 3

    I.      Statutory and Regulatory Background .................................................................. 3

          A.     The Medicare Statute ................................................................................ 3

          B.     The "Extreme and Uncontrollable Circumstances" Rule ........................... 5

    II.     Factual and Procedural Background ..................................................................... 8

Standard of review ......................................................................................................... 10

Argument ........................................................................................................................ 12

    I.      The Extreme and Uncontrollable Circumstances Rule Is Not Arbitrary and
          Capricious. ......................................................................................................... 12

          A.     The Purpose of the Extreme and Uncontrollable Circumstances Rule Is to
                Allow for Star Ratings Adjustments in Certain Narrow Circumstances, and
                the Requirement of a Declared Public Health Emergency Furthers that
                Purpose .................................................................................................... 13

          B.     CMS's Separate Disaster Rule Has a Different Purpose, and It Is Not
                Arbitrary and Capricious for the Agency to Apply Different Standards to
                Different Policies. .................................................................................... 18

          C.     Plaintiffs Cannot Show that Contracts Operating Under a Public Health
                Emergency Are "Similarly Situated" to Contracts Not Operating Under a
                Public Health Emergency. ....................................................................... 20

    II.     The Requirement of a Public Health Emergency Declaration to Trigger the
          Extreme and Uncontrollable Circumstances Rule is Not Severable. ................... 24

    III.    If The Court Orders Any Remedy, Remand Without Vacatur Is Proper, and
          Florida Blue's Requested Individual Relief Is Untenable. ................................. 27

          A.     If This Court Finds Error, It Should Remand Without Vacatur. .............. 27

          B.     Plaintiff-Specific Relief Is Inappropriate ................................................. 28

Conclusion ..................................................................................................................... 29

# TABLE OF AUTHORITIES

## Cases

*Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n,*
  988 F.2d 146–51 (D.C. Cir. 1993) ...................................................................... 28

*Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.,*
  419 U.S. 281 (1974) ........................................................................................... 12

*Bridgeport Hosp. v. Becerra,*
  108 F.4th 882 (D.C. Cir. 2024) ......................................................................... 28

*County of Los Angeles v. Shalala,*
  192 F.3d 1005 (D.C. Cir. 1999) ......................................................................... 11

*Ctr. for Food Safety v. Salazar,*
  898 F. Supp. 2d 130 (D.D.C. 2012) .................................................................. 12

*Dist. Hosp. Partners, L.P. v. Burwell,*
  786 F.3d 46 (D.C. Cir. 2015) ............................................................................. 12

*Gentiva Healthcare Corp. v. Sebelius,*
  857 F. Supp. 2d 1 (D.D.C. 2012) ...................................................................... 11

*Grayscale Investments v. Securities and Exchange Commission*
  82 F.4th 1239 (D.C. Cir. 2023) ......................................................................... 24

*Marsh v. Or. Nat. Res. Council,*
  490 U.S. 360 (1989) ........................................................................................... 12

*MD/DC/DE Broadcasters Ass'n v. F.C.C.,*
  236 F.3d 13 (D.C. Cir. 2001) ............................................................................. 25

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ............................................................................................. 12

*New York v. Dep't of Health & Human Servs.*
  accord. , 414 F. Supp. 3d 475 (S.D.N.Y. 2019) ................................................ 25

*Palisades Gen. Hosp. Inc. v. Leavitt,*
  426 F.3d 400 (D.C. Cir. 2005) ........................................................................... 27

*Petal Gas Storage, L.L.C., v. FERC,*
  496 F.3d 695 (D.C. Cir. 2007) ........................................................................... 12

*Se. Ala. Med. Ctr. v. Sebelius,*
  572 F.3d 912 (D.C. Cir. 2009) ........................................................................... 11

*Sierra Club v. Fed. Energy Reg. Comm'n,*
  97 F.4th 16 (D.C. Cir. 2024) ............................................................................. 18

*United States v. Arthrex,*
594 U.S. 1 (2021) ................................................................ 16, 22

*Whole Women's Health v. Hellerstedt,*
579 U.S. 582 (2016) ............................................................ 25

**Statutes**

5 U.S.C. § 706 ...................................................................... 11, 29
42 U.S.C. § 247d .................................................................. 8, 13, 22
42 U.S.C. § 1320b-5 ............................................................ passim
42 U.S.C. § 1395 .................................................................. 3
42 U.S.C. § 1395j ................................................................. 3
42 U.S.C. § 1395w-21 .......................................................... 3
42 U.S.C. § 1395w-22 .......................................................... 3, 19, 20
42 U.S.C. § 1395w-23 .......................................................... 3, 4, 5
42 U.S.C. § 1395w-24 .......................................................... 8
42 U.S.C. § 1395w-21 .......................................................... 3
42 U.S.C. § 1395w-23 .......................................................... 4, 7
42 U.S.C. § 1395w-101 ........................................................ 3

**Other**

42 C.F.R. § 422.100 ............................................................. 19, 20, 27
42 C.F.R. § 422.164 ............................................................. 4
42 C.F.R. § 422.166 ............................................................. 7, 17
42 C.F.R. § 422.254 ............................................................. 4
42 C.F.R. § 422.258 ............................................................. 3
42 C.F.R. § 422.260 ............................................................. 4, 5
42 C.F.R. § 422.266 ............................................................. 5
42 C.F.R. § 422.162 ............................................................. passim
83 Fed. Reg. 16,440 ............................................................ 4
83 Fed. Reg. 54982 ............................................................. 6
83 Fed. Reg. 16520 ............................................................. 4, 5, 13
83 Fed. Reg. 55025 ............................................................. 13
84 Fed. Reg. 15680 ............................................................. 7
84 Fed. Reg. 15771 ............................................................. 14, 16, 17

84 Fed. Reg. 15,821 ........................................................................................... 14, 27

84 Fed. Reg. 15770 ...................................................................................... 13, 15, 16, 26

84 Fed. Reg. 15772 ...................................................................................... 16, 17, 18

87 Fed. Reg. 27704 ....................................................................................... 19, 20

87 Fed. Reg. 27805 ............................................................................................. 20

88 Fed. Reg. 34883 ............................................................................................... 8

Defendants respectfully submit this memorandum in support of their cross-motion for summary judgment and in opposition to Plaintiffs' motion for summary judgment, ECF No. 10.

## INTRODUCTION

Some, but not all, natural disasters result in a declaration of a public health emergency by the Secretary of Health and Human Services. If the Secretary declares a public health emergency, doctors, hospitals, and other providers in the area affected by the emergency can receive waivers under which certain Medicare statutory and regulatory provisions will not be enforced during the emergency. Under a rule promulgated by the Centers for Medicare & Medicaid Services ("CMS"), insurers who cover Medicare beneficiaries via Medicare Advantage can also receive relief from generally applicable policies governing the calculation of Medicare Advantage and Part D Star Ratings when a certain percentage of their enrollees are affected by a natural disaster that is accompanied by a declared public health emergency. Plaintiffs say that rule is arbitrary and capricious because it should extend to certain other disasters that, they say, are comparable in severity to those that result in a public health emergency. They would replace the agency's bright-line rule—one triggered in relevant part by a cabinet official's public declaration—with a standard under which federal courts pick and choose which disasters should "count" when it comes to modifying the Star Ratings calculation method. Under well-established caselaw, this Court may not substitute its judgment for that of the agency, and Plaintiffs' challenge should fail.

The agency's rule is in any event sensible on its face. The waivers that the Secretary can issue during a declared public health emergency are designed to "ensure to the maximum extent feasible . . . that sufficient health care items and services are available to meet the needs of individuals" affected by the public health emergency. 42 U.S.C. § 1320b-5(a). Congress has thus determined that there is a correlation between declared public health emergencies and a risk of

Medicare beneficiaries, among others, having difficulty accessing health care.  The regulation at issue here links the ability of Medicare Advantage Organizations to obtain relief from the standard method of calculating Star Ratings with a Secretarial action designed to ensure continued availability of "sufficient health care items and services" to meet affected individuals' needs.

In 2023, Broward County, Florida, experienced massive flooding.  The Governor of Florida declared a contemporaneous State of Emergency and, two weeks later, the Federal Emergency Management Agency ("FEMA") announced the availability of Individual Assistance to people affected by the floods.  But the Secretary did not declare a public health emergency.  By the plain terms of the Extreme and Uncontrollable Circumstances rule, the Broward County floods did not trigger eligibility for a modification of the Star Ratings calculation method.  Plaintiffs here, collectively doing business as Florida Blue, provide Medicare Advantage and Medicare Part D coverage to beneficiaries in Florida, including in Broward County.  They bring this suit to challenge the Extreme and Uncontrollable Circumstances Rule as arbitrary and capricious, arguing that because the Broward County flooding produced record rainfall and resulted in a contemporaneous state of emergency (declared by the Governor) and subsequent FEMA individual assistance, it should be treated identically to other disasters for which the Secretary declared an accompanying public health emergency.  But the Secretary did *not* declare a public health emergency covering Broward County, and it is not arbitrary and capricious for a regulation governing health insurers and promulgated by a component of the Department of Health and Human Services to require a declared public health emergency before modifying its default rules.  Plaintiffs articulate, at most, a policy disagreement—but the arbitrary and capricious standard of review does not permit a court to substitute its policy judgments for those of the agency.  Plaintiffs' challenge therefore should fail, and this Court should grant summary judgment to Defendants.

## BACKGROUND

I.    <u>Statutory and Regulatory Background</u>

A.    **The Medicare Statute**

Medicare is a federal health insurance program for the elderly and persons with disabilities. *See* 42 U.S.C. § 1395 *et seq.* Medicare covers hospitalizations under Part A of the statute, *id.* §§ 1395c to 1395i-6, outpatient medical care under Part B, *id.* §§ 1395j to 1395w-6, and prescription drugs under Part D, *id.* §§ 1395w-101 to 1395w-154. This case concerns Medicare Advantage, formerly known as Medicare+Choice, which Congress established in Part C of the statute, *id.* §§ 1395w-21 to 1395w-29.

Under Medicare Advantage, the federal government pays insurers to provide the coverage that participating beneficiaries would otherwise receive through Parts A and B (sometimes known, collectively, as "traditional" Medicare). *Id.* § 1395w-22(a). These insurers, known as Medicare Advantage Organizations, contract to provide coverage in a particular geographic area. Beneficiaries can then choose among the plans available where they reside. *Id.* § 1395w-21(b). The Organizations receive a predetermined sum for providing coverage to each beneficiary, based in part on demographic and health characteristics of the beneficiary. *Id.* § 1395w-23(a)(1)(A), (C).

To calculate payments to Medicare Advantage Organizations, CMS first determines its "benchmark," based on the per capita cost of covering Medicare beneficiaries under Parts A and B in the relevant geographic area. *Id.* § 1395w-23(n); 42 C.F.R. § 422.258. Each Medicare Advantage Organization then submits a "bid," telling CMS what payment the Organization will accept to cover a beneficiary with an average risk profile in that area. 42 C.F.R. § 422.254. If the insurer's bid is less than the benchmark, the bid becomes its "base payment" – the amount it is paid for covering a beneficiary of average risk – and the insurer receives a portion of the difference between its bid and the benchmark as a "rebate" that the Organization can use to fund supplemental

benefits for beneficiaries or reduce plan premiums. 42 U.S.C. § 1395w-24(b)(1)(C); 42 C.F.R. § 422.260. If the Medicare Advantage Organization's bid is greater than the benchmark, then the benchmark becomes its base payment, and the insurer must charge beneficiaries a premium to make up the difference. *See* 42 U.S.C. §§ 1395w-23(a)(1)(B)(ii), 1395w-24(b)(2)(A).

Star Ratings are a means by which CMS measures the quality of Medicare Advantage plans (and Part D Prescription Drug Plans) on a scale of 1 to 5 "Stars," based on Medicare Advantage data collected by CMS. 42 U.S.C. § 1395w-23(o)(4)(A); *see also* § 1395w-22(e)(3). Star Ratings reflect the experiences of beneficiaries in these plans and assist beneficiaries in finding the best plans for their needs.

CMS has released Star Ratings for Medicare Advantage contracts since 2008. Contract Year 2019 Policy & Technical Changes to the MA Program, 83 Fed. Reg. 16,440, 16,520 (Apr. 16, 2018). In a 2018 rulemaking, CMS adopted the regulatory framework for the Star Ratings and has since then used notice-and-comment rulemaking to adopt changes in the methodology and addition of new measures. *Id.*; *see also* 42 C.F.R. § 422.164(c) & (d). The 2018 final rule describes the purpose of the Star Ratings system: it "is designed to provide information to the beneficiary that is a true reflection of the plan's quality and encompasses multiple dimensions of high quality care." 83 Fed. Reg. at 16,520.

Star Ratings affect payments to Medicare Advantage Organizations in two main ways. First, Medicare Advantage plans that earn a rating of 4 stars or higher qualify for Medicare Advantage Quality Bonus Payments in the form of an increased benchmark for the contract year following the ratings year (*e.g.*, the 2025 Star Ratings can increase the Medicare Advantage bidding benchmarks for contract year 2026). 42 U.S.C. § 1395w-23(o)(1) (increasing, for qualifying plans, the applicable percentage that calculates the benchmark);

- 4 -

§ 1395w-23(o)(3)(A)(i) (a qualifying plan is one that earns a rating of 4 stars or higher).  This in turn can allow a Medicare Advantage plan to increase its bid, receive higher rebates, or lower premiums.  *See id.* § 1395w-24(b)(1)(C); 42 C.F.R. § 422.260.

Second, Star Ratings affect the level of rebate received by plans that bid below their benchmarks for the contract year following the ratings year (*e.g.*, the 2025 Star Ratings are used to set plans' rebate percentages for contract year 2026).  Plans that earn a rating of 4.5 stars or higher receive a rebate of 70% of the difference between their bid and the benchmark, while plans that earn 3.5 or 4 stars receive a rebate of 65% of that difference, and plans that earn less than 3.5 stars are eligible for a rebate of 50% of that difference.  42 U.S.C. § 1395w-24(b)(1)(C)(v) (listing the "final applicable rebate percentage[s]" by rating); 42 C.F.R. § 422.266(a)(2)(ii) (same).

CMS publishes the Star Ratings each October for the upcoming year at the contract level, with each plan offered under that contract assigned the contract's rating.  *See* 42 C.F.R. §§ 422.162(b); 422.166; 423.182(b); and 423.186.  It published the 2025 Star Ratings, for example, in October 2024.  CMS, FACT SHEET - 2025 MEDICARE ADVANTAGE AND PART D STAR RATINGS (Oct. 10, 2024), *available at* [Factsheet: 2025 Medicare Advantage and Part D Rate Star Ratings October 10, 2024](#).  CMS uses a variety of data including administrative and medical record review data collected as part of the Healthcare Effectiveness Data and Information Set ("HEDIS") and survey-based data from the Health Outcomes Survey and from the Consumer Assessment of Healthcare Providers and Systems ("CAHPS").  83 Fed. Reg. at 16,520, 16,525.

### B.     The "Extreme and Uncontrollable Circumstances" Rule

In 2018, CMS issued a proposed rule covering multiple aspects of the Star Ratings.  Among its proposals was one for "adjust[ing] the Star Ratings to take into account the effects of extreme and uncontrollable circumstances that occurred during the performance or measurement period."  83 Fed. Reg. 54982, 55025 (Nov. 1, 2018).  As CMS acknowledged, it had already announced

those policies via sub-regulatory guidance in the 2019 Call Letter, the document through which the agency had historically communicated modifications to the Star Ratings methodology.  Its proposed rule "describe[d] proposed policies for identifying affected contracts and adjusting the Star Ratings measures" that were "largely the same as those described in the 2019 Call Letter," with the elimination of one adjustment that did not affect the final calculations.  *Id.*  CMS explained that extreme and uncontrollable circumstances, in addition to "directly affect[ing] Medicare beneficiaries and providers [and] the Parts C and D organizations that provide them with important medical care and prescription drug coverage," may also "negatively affect the underlying operational and clinical systems that CMS relies on for accurate performance measurement of the Star Ratings Program."  *Id.* at 55025.  CMS proposed that "the adjustments be tailored to the specific areas experiencing the extreme and uncontrollable circumstances in order to avoid over-adjustment or adjustments that are unnecessary."  *Id.*  To that end, CMS proposed three criteria for determining whether a contract was an "affected contract" eligible for the adjustment:

- The contract's service area is within an "emergency area" during an "emergency period" as defined in Section 1135(g) of the [Social Security] Act.

- The contract's service area is within a county, parish, U.S. territory or tribal area designated in a major disaster declaration under the Stafford Act and the Secretary exercised authority under section 1135 of the Act based on the same triggering event(s).

- A certain minimum percentage (25 percent for measure star adjustments or 60 percent for exclusion from cut point and Reward Factor calculations) of the enrollees under the contract must reside in a Federal Emergency Management Agency (FEMA)-designated Individual Assistance area at the time of the extreme and uncontrollable circumstance.

*Id.*[1]  CMS proposed that contracts not satisfying the criteria to be an "'affected contract' would not be eligible for any adjustments based on the occurrence of the extreme and uncontrollable

---

[1]      Section 1135 of the Social Security Act is codified at 42 U.S.C. § 1320b-5.  Because the regulation refers to Section 1135 and "Section 1135 Waiver" is a common shorthand for secretarial

circumstances." *Id.* at 55026.  After the comment period, CMS finalized the Extreme and Uncontrollable Circumstances Rule.  In response to comments, it added an explicit policy for "contracts affected by disasters multiple years in a row."  84 Fed. Reg. 15680, 15774 (Apr. 16, 2019).  The agency finalized its proposed definition of an "affected contract" with minimal changes. *Id.* at 15772.

The Extreme and Uncontrollable Circumstances Rule is codified at 42 C.F.R. §§ 422.166(i) (for Part C plans) and 423.186(i) (for Part D plans).[2]  While the codified provisions do not mention Public Health Emergencies directly, they do explicitly reference Section 1135(g) of the Social Security Act, and the Secretary may only exercise authority under Section 1135(g)—and an "emergency period" and an "emergency area" under the same statute may only exist—if the Secretary has declared a Public Health Emergency.  *See* 42 U.S.C. §§ 247d(a) (criteria for Secretarial determination of public health emergency); 1320b-5(g)(1)(B) (defining "emergency area" and "emergency period" in part to require "a public health emergency declared by the Secretary pursuant to section 247d of this title").  The Extreme and Uncontrollable Circumstances rule can only apply if there is a public health emergency declaration under 42 U.S.C. § 247d (*see* 42 C.F.R. § 422.166(i)(1)(i) & (ii) (incorporating Section 1135, which in turn requires a declaration under 42 U.S.C. § 247d), a major disaster declaration under the Stafford Act[3] (*see* 42 C.F.R. § 422.166(i)(1)(ii)), and a certain minimum percentage of enrollees residing in a FEMA-

---

action under 42 U.S.C. § 1320b-5, this brief uses "Section 1135" and "Section 1320b-5" interchangeably.

[2]    Because the rules are identical for Part C and Part D plans, this brief generally cites only the Part C provision (42 C.F.R. § 422.166(i)).

[3]    The Stafford Act, 42 U.S.C. § 5121 *et seq.*, "provide[s] an orderly and continuing means of assistance by the Federal Government to State and local governments in carrying out their responsibilities to alleviate the suffering and damage which result from" disasters.

designated Individual Assistance area at the time of the extreme and uncontrollable circumstances (*see* 42 C.F.R. § 422.166(i)(iii)).

## II.    **Factual and Procedural Background**

A large rainstorm struck Broward County, Florida, from April 12 through 14, 2023.  The storm caused significant flooding.  As a result of the flooding, the Governor of Florida on April 13 declared a state of emergency in Broward County.  Two weeks later, the President "issued a major disaster declaration" covering Broward County.  88 Fed. Reg. 34883, 34884 (May 31, 2023).  In a press release shortly after the disaster declaration, FEMA stated that the "President's action makes federal funding available to affected individuals in Broward County.  Assistance can include grants for temporary housing and home repairs, low-cost loans to cover uninsured property losses, and other programs to help individuals and businesses recover from the effects of the disaster."  FEMA press release, President Joseph R. Biden, Jr. Approves Major Disaster Declaration for Florida | FEMA.gov.  The Secretary of Health and Human Services consulted with state officials, *see* AR 391,[4] and did not declare a Public Health Emergency related to the Broward County Flooding.

In August 2023, Hurricane Idalia struck Florida.  The Secretary of Health and Human Services issued a determination that a Public Health Emergency existed "as a result of the consequences of Hurricane Idalia on the State of Florida," dated August 30, 2023, and retroactive to August 27, 2023.  *See*  https://aspr.hhs.gov/legal/PHE/Pages/Florida-Hurricane-Idalia-Aug2023.aspx.

---

[4]    Citations to the "AR" refer to the Administrative Record, the certification and index to which appears at ECF No. 8.  Citations to the "RR" refer to the Rulemaking Record, the certification and index to which appears at ECF No. 9.  Both records were served on Plaintiffs' counsel.

Each year, as part of the process of calculating and publishing Star Ratings, CMS issues an "Advance Notice of Methodological Changes." *See* AR 195-380 (Calendar Year 2025 Advance Notice). That notice includes a "List of Section 1135 Waivers Issued in Relation to the FEMA Major Disaster Declarations." *See* AR 312. Consistent with the fact that there was no Public Health Emergency declaration related to the Broward County floods, Broward County does not appear on the Calendar Year 2025 list or on the immediately following list of "Individual Assistance Counties and County-Equivalents." AR 313. Hurricane Idalia does appear on the list of Section 1135 waivers (twice, once for Florida and once for Georgia), and the affected counties in Florida are listed. AR 312-13.

Following publication of the Advance Notice, an employee of Florida Blue sent an email to the CMS Part C & D Star Ratings email inbox inquiring as to "why a waiver was not issued for this disaster," referring to the Broward County floods. AR 381. CMS responded, copying the regulatory text at 42 C.F.R. §§ 422.166(i) & 423.186(i) and explained that the "Part C and D Star Ratings mailbox is not able to answer questions about why an 1135 waiver was not issued for a particular disaster." *Id*. Florida Blue submitted a comment letter on the Calendar Year 2025 Advance Notice of Methodological Changes, noting that there was no 1135 waiver issued for the Broward County floods. AR 385. Florida Blue provided data showing decreased office visit and prescription fill rates during the week of the Broward County flooding when compared to the seven-week average, but also noted that "the flooding wasn't as severe as originally anticipated when FEMA declared individual assistance designation for Broward." AR 386. Florida Blue "request[ed] that this disaster be included in the list of FEMA declared individual assistance designations in the CY 25 Final Notice." *Id*. Florida Blue separately asked the Director of CMS's Division of Consumer Assessment and Plan Performance to "treat the Broward County FEMA

disaster declaration as you would those listed in the CY 25 Advance Notice."  AR 391.  In response, the division director stated that CMS is "required to follow the methodology codified in regulation so cannot make exceptions in how we administer the disaster policy for Star Ratings." AR 390.  When CMS published its Calendar Year 2025 Rate Announcement, Broward County was not included on the list of Section 1135 waivers or individual assistance counties.  AR 135-36.

During the Star Ratings Plan Preview period, Florida Blue again sought via the Part C & D Star Ratings email inbox a "one-time exception to the Part C and D Star Ratings extreme and uncontrollable circumstance provision."  AR 394.  In response, CMS stated it was "unable to apply the extreme and uncontrollable circumstance adjustment . . . as your contracts do not meet the requirements to receive this adjustment."  AR 393.  Florida Blue also submitted a request for an adjustment to the CMS Administrator on November 27, 2024.  AR 395-97.  For the two contracts for which it requested adjustment, eight percent and four percent of the total enrollees resided in Broward County.  AR 396.  Another 18% and 22%, respectively, resided in counties affected by Hurricane Idalia for which the Secretary of HHS had declared a Public Health Emergency. AR 396.  The Deputy Director of the Center for Medicare (a CMS component) responded on December 20, 2024, quoting applicable regulations and denying the request for an adjustment.  AR 398-99.

Plaintiffs filed their complaint a week later, on December 27, 2024.  ECF No. 1.  The Court subsequently granted the parties' jointly proposed briefing schedule.  ECF Nos. 6, 7.  Plaintiffs filed their opening brief on February 17, 2025.  ECF No. 19 ("Pls. Mot.").  Defendants now respond to Plaintiffs' motion and cross-move for summary judgment.

## STANDARD OF REVIEW

In this action proceeding under the Medicare statute, judicial review is governed by the standards of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and decided on an

administrative record. *Se. Ala. Med. Ctr. v. Sebelius*, 572 F.3d 912, 916-17 (D.C. Cir. 2009). Accordingly, "'the district court does not perform its normal role' but instead 'sits as an appellate tribunal'" resolving legal questions. *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999) (quoting *PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995)). Although the parties move for summary judgment, the "standard set forth in Rule 56(c) . . . does not apply." *Gentiva Healthcare Corp. v. Sebelius*, 857 F. Supp. 2d 1, 6 (D.D.C. 2012), *aff'd*, 723 F.3d 292 (D.C. Cir. 2013). Rather, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id*.

The APA provides for courts to "hold unlawful and set aside agency action, findings, and conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C). Under the APA's "arbitrary or capricious" standard, the Court "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989). An agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). Even a decision that is not fully explained may be upheld "if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

The "arbitrary or capricious" standard is "narrow . . . as courts defer to the agency's expertise." *Ctr. for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 138 (D.D.C. 2012) (quoting

*Motor Vehicle*, 463 U.S. at 43).  The Court "is not to substitute its judgment for that of the agency." *Id*.  In Medicare cases, the "'tremendous complexity of the Medicare statute" "adds to the deference which is due to the Secretary's decision.'"  *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 60 (D.C. Cir. 2015) (quoting *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1229 (D.C. Cir. 1994)).  The question is not whether the agency's policy is the "best" or only solution, but whether it is a "reasonable solution."  *See Petal Gas Storage, L.L.C., v. FERC*, 496 F.3d 695, 703 (D.C. Cir. 2007).

## ARGUMENT

### I.    The Extreme and Uncontrollable Circumstances Rule Is Not Arbitrary and Capricious.

The Extreme and Uncontrollable Circumstances Rule provides a narrow exception to CMS's general policy that Star Ratings are based on data collected during the relevant year.  CMS explicitly wanted to avoid unnecessary adjustments to the Star Ratings methodology, and it wanted to link the availability of adjustments to situations where operational and clinical systems supporting performance measurements were affected.  The connection between the Extreme and Uncontrollable Circumstances Rule and a declared public health emergency serves both goals. Only those natural disasters where the Secretary, "after consultation with such public health officials as may be necessary," determines that either "a disease or disorder presents a public health emergency" or "a public health emergency . . . otherwise exists," 42 U.S.C. § 247d(a), can result in Star Ratings methodology adjustments under the Extreme and Uncontrollable Circumstances Rule.  CMS sensibly determined that a contemporaneous determination by the Secretary of a public health emergency was a reasonable proxy for the level of seriousness and threat to key systems that would justify modifying the Star Ratings methodology.  Plaintiffs disagree with the portion of the Extreme and Uncontrollable Circumstances rule that requires a declaration of a public health

emergency by the Secretary before the rule can apply.  Applying the narrow arbitrary and capricious standard of review, this Court, however, should not, replace its judgment for that of the agency.

> ### A.    The Purpose of the Extreme and Uncontrollable Circumstances Rule Is to Allow for Star Ratings Adjustments in Certain Narrow Circumstances, and the Requirement of a Declared Public Health Emergency Furthers that Purpose.

In both its proposed and final rules, CMS explained that extreme and uncontrollable circumstances such as natural disasters could affect not only beneficiaries, providers, and Parts C and D organizations, but also "the underlying operational and clinical systems that CMS relies on for accurate performance measurement in the Star Ratings program."  83 Fed. Reg. at 55025 (proposed rule); *see* 84 Fed. Reg. at 15770 (final rule).  CMS thus envisioned that only a subset of natural disasters would generate the circumstances justifying a departure from the typical method it uses to calculate Star Ratings.  CMS's statement that the Extreme and Uncontrollable Circumstances Rule was developed "in response to the multiple disasters in 2017 and 2018, including several hurricanes and wildfires," does not imply that *every* hurricane and wildfire—or even every hurricane and wildfire causing a local emergency declaration or a FEMA emergency declaration—would create "extreme and uncontrollable circumstances" justifying modification of the Star Ratings process for contracts affected by the disaster.  84 Fed. Reg. at 15,821; *see* Plaintiffs' MSJ at 28.  The Secretary declared Public Health Emergencies arising out of hurricanes and wildfires in 2017 and 2018.  *See* List of Public Health Emergency Declarations (public health emergency declarations arising from Hurricanes Michael, Florence, Maria, Nate, Irma, and Harvey; public health emergency declarations arising California wildfires in 2017 and 2018); *see also* 84 Fed. Reg. at 15,771 (2019 Star Ratings adjusted for Hurricanes Harvey, Irma, and Maria, as well as California wildfires).  For the 2017 and 2018 period, there were 118 FEMA Major

Disaster declarations, including for a hurricane that did not generate a public health emergency declaration (Hurricane Lane), wildfires that did not generate a public health emergency declaration (Oklahoma Wildfires), and numerous instances of severe storms and flooding that did not generate a public health emergency declaration. *See* Disasters and Other Declarations | FEMA.gov. Notably, for the 2017-2018 period CMS looked to as it developed the Extreme and Uncontrollable Circumstances rule, there were *no* instances of flooding leading to a declared Public Health Emergency, despite multiple such instances leading to a FEMA Major Disaster. There is no evidence that the "multiple disasters in 2017 and 2018" to which the agency referred included flooding events, nor is there evidence that CMS intended to include floods as a category among the extreme and uncontrollable circumstances necessarily justifying a Star Ratings adjustment.[5]

CMS's rule is consistent with its stated purposes. CMS wanted to adjust Star Ratings for "specific areas experiencing the extreme and uncontrollable circumstances" but "avoid over-adjustment or adjustments that are unnecessary." 84 Fed. Reg. at 15770. A statutory provision allows the Secretary of Health and Human Services to waive certain provisions of the Medicare statute and regulations during a declared public health emergency. *See* 42 U.S.C. § 1320b-5 (the Secretary has the authority in a declared Public Health Emergency "to temporarily waive or modify the application of, with respect to health care items and services furnished by a health care provider . . . in any emergency area . . . during any portion of an emergency period, the requirements of title[] . . . XVIII [the Medicare statute] . . . or any regulation thereunder."). It is logical that a regulation that operates to provide regulatory relief under certain circumstances to Medicare

---

[5] To be sure, the rule has subsequently applied to floods when a public health emergency was declared. But there is no evidence that the agency meant categorically to include disasters such as the Broward County flood when it was crafting the rule, or that the requirement of a public health emergency declaration runs counter to its goals.

Advantage insurers would be triggered, in part, by availability of Secretarial waivers of other portions of the Medicare statute and regulations affecting providers directly.  Indeed, if the Extreme and Uncontrollable Circumstances rule could be triggered without a declared Public Health Emergency, it would raise the possibility of Medicare Advantage Organizations receiving a reprieve from otherwise generally applicable regulations despite the unavailability of regulatory waiver for providers of services.  Nor is the Extreme and Uncontrollable Circumstances Rule unique among regulations implementing the Medicare statute in looking to whether the Secretary has declared a public health emergency.  *See* 42 C.F.R. §§ 410.79(e) (emergency policy for Medicare Diabetes Prevention Program expanded model); 412.622(a)(ii) (section 1135 exception for payment policy covering Inpatient Rehabilitation Facilities).

Making a declared Public Health Emergency a prerequisite for application of the Extreme and Uncontrollable Circumstances Rule thus does not "run[] directly counter to CMS's stated purpose of and justification for the rule."  Pl. Mot. (ECF No. 10) at 29.  The agency nowhere expressed an intent to have the rule apply outside of the narrow circumstances where a natural disaster "directly affect[s] Medicare beneficiaries and providers," "Parts C and D organizations," and the "underlying operational and clinical systems that CMS relies on for accurate performance measurement in the Star Ratings program."  A declared Public Health Emergency, which requires a Secretarial determination that "a disease or disorder presents a public health emergency; or [] a public health emergency . . . otherwise exists" is a sound proxy for that.  It has the added benefit of being based on the discretion of a Senate-confirmed official who is directly accountable to (and may be removed by) the President.  *See United States v. Arthrex*, 594 U.S. 1, 12 (2021).  And, as the agency pointed out in response to a comment, Stafford Act and Section 1135 declarations are

public, meaning the process of determining which contracts are affected is transparent.  *See* 84 Fed. Reg. at 15771-72.

Plaintiffs assume that the discrepancy between federal disaster declarations and Section 1135 waivers undercuts the rule.  Pl. Mot. (ECF No. 10) at 29.  But they do not acknowledge the agency's stated desire to "avoid over-adjustment or adjustments that are unnecessary."  84 Fed. Reg. at 15770.  In the Final Rule, CMS was clear that previous adjustments to the Star Ratings based on natural disasters had occurred only when there was a declared Public Health Emergency. 84 Fed. Reg. at 15,771 (citing adjustments to 2019 Star Ratings for "Hurricanes Harvey, Irma, and Maria, and the wildfires in California").  CMS did not express an intent to broaden the scope of situations that justify a departure from the ordinary Star Ratings methodology.  There is nothing arbitrary and capricious about a department component tasked with regulating insurers that furnish coverage to Medicare beneficiaries requiring a declaration by the head of the department that "a disease or disorder presents a public health emergency; or [] a public health emergency . . . otherwise exists" before permitting deviations from its usual methodology.  Plaintiffs would prefer that the agency have chosen broader criteria, but at most they have articulated a policy disagreement, not a showing that the agency's selection of criteria was arbitrary and capricious.

The agency's response to a single comment on its proposed rule does not alter this analysis. That commenter, RxAnte, performed an analysis that "examined the influence Hurricane Irma had on medication adherence in a Medicare population."  RR 627.  It further found that "the impact of such extreme and uncontrollable circumstances may be highly concentrated to certain zip codes or counties, and may not rise to the level of a state-level state of emergency."  *Id.*  RxAnte was "unclear on whether criteria #1 and #2 require a state-level declaration of emergency to qualify selected geographies and contracts as eligible for adjustment.  If so, this may be too restrictive."

- 16 -

*Id.*  RxAnte suggested that the "minimum percentage of enrollees residing in a FEMA-designated Individual Assistance Area is most applicable to identify the impact of an uncontrolled event."  *Id.*

It is worth noting that the commenter's analysis involved a single natural disaster, Hurricane Irma, which generated a declared Public Health Emergency and qualified for CMS's earlier sub-regulatory extreme and uncontrollable circumstances policy.  *See* 84 Fed. Reg. at 15771.  And CMS's rule did (and does) not require a state-level emergency declaration, although it is true as a practical matter that such declarations often accompany federal emergency declarations.  Responding to the comment, CMS noted that "Stafford Act disaster declarations are made by [a] state but designate specific counties that are affected."  84 Fed. Reg. at 15772.  CMS went on to say that its proposal to require that a disaster meet all three criteria in 42 C.F.R. § 422.166(i)(1) "ensures that the extreme and uncontrollable circumstances policy is limited to contracts that may have experienced a real impact from the disaster or ability to serve enrollees. It also ensures that it applies only when the event is extreme, meriting the use of special adjustments to the Star Ratings."  84 Fed. Reg. at 15772.

There is a clear connection, rooted in statutory text, between the availability of section 1135 waivers and a Medicare Advantage contract having "experienced a real impact from the disaster or ability to serve enrollees."  The purpose of the statute permitting waivers of certain provisions of the Medicare statute during a declared Public Health Emergency "is to enable the Secretary to ensure to the maximum extent feasible, in any emergency area and during an emergency period . . . that sufficient health care items and services are available to meet the needs of individuals enrolled in [Medicare]; and [ ] that health care providers . . . may be reimbursed for such items and services."  42 U.S.C. § 1320b-5(a).  Section 1135 waivers are explicitly designed to ensure continued access to healthcare for Medicare beneficiaries living in an area affected by a

Public Health Emergency during the duration of that emergency and are thus directly connected to a Medicare Advantage contract having "experienced a real impact from the disaster or ability to serve enrollees."  Neither a Stafford Act emergency declaration nor the percentage of enrollees that "reside in a [FEMA]-designated Individual Assistance area" has any similar connection to a contract's "ability to serve enrollees."

That the agency's explanation was concise does not mean it was arbitrary and capricious. *See Sierra Club v. Fed. Energy Reg. Comm'n*, 97 F.4th 16, 29 (D.C. Cir. 2024).  The question is whether the agency's "rationale was discernable and therefore adequate."  *Id.*  The agency's explanation meets that test, particularly in light of its frequently expressed intent to provide a narrow exception for extreme and uncontrollable circumstances to the general rule for calculating Star Ratings.  It is, moreover, far from clear from the comment CMS was responding to that the commenter was actually urging CMS to abandon the first two of its proposed three criteria for finding a contract "affected."  *See* RR 627.  Given that the commenter's sole source of data involved a disaster where a public health emergency was in fact declared as well as the commenter's expression of uncertainty, CMS's explanation was more than adequate under the arbitrary and capricious standard.

### B.    CMS's Separate Disaster Rule Has a Different Purpose, and It Is Not Arbitrary and Capricious for the Agency to Apply Different Standards to Different Policies.

Plaintiffs argue that a different rule, with a different purpose, should have the same set of triggering criteria because both rules involve disasters or emergencies.  CMS has a separate rule requiring that Medicare Advantage Organizations "ensure access to covered benefits" in four specified ways during a declared "disaster or emergency" and "there is disruption of access to health care."  42 C.F.R. § 422.100(m).  The four actions a plan must take are:

(i) Cover Medicare Parts A and B services and supplemental Part C plan benefits furnished at non-contracted facilities subject to § 422.204(b)(3).

(ii) Waive, in full, requirements for gatekeeper referrals where applicable.

(iii) Provide the same cost-sharing for the enrollee as if the service or benefit had been furnished at a plan-contracted facility.

(iv) Make changes that benefit the enrollee effective immediately without the 30-day notification requirement at § 422.111(d)(3).

42 C.F.R. § 422.100(m)(1).  As the agency explained when it revised the rule in 2022, 42 U.S.C. § 1395w-22 "requires [Medicare Advantage] organizations to provide continued availability of and access to covered benefits, including making medically necessary benefits available and accessible 24 hours a day and 7 days a week; the ability to limit coverage to benefits received from a plan's network of providers is contingent on fulfilling this obligation."  87 Fed. Reg. 27704, 27798 (May 9, 2022).  CMS went on: "When a disaster or emergency occurs, enrollees may have trouble accessing services through network providers or sometimes must physically relocate to locations that are outside of their [Medicare Advantage] plan's service area."  *Id.*  This rule, in other words, is not meant as a response to broad public health concerns but is more narrowly targeted to ensuring that beneficiaries' difficulty accessing in-network providers during an emergency (including one that requires physical relocation) does not cause them to lose access to care.  Indeed, not all disasters covered by section 422.100(m) require an adjustment by plans; there must also be a "disruption of access to health care," meaning an "interruption nor interference" that results in "[Medicare Advantage] plans failing to meet the normal prevailing patterns of community health care delivery."  42 C.F.R. § 422.100(m)(6).  It is true that some disasters (i.e., those resulting in a declaration by a Governor but no federal declaration, or those where there is no federal public health emergency declared) will require plans to comply with Section 422.100(m) but will not result in a Star Ratings adjustment under section 422.166(i).  But the two rules serve discrete purposes.  Most obviously, section 422.100(m) is explicitly designed to

implement 42 U.S.C. § 1395w-22 (governing beneficiary access to care) and section 422.166(i) is not. Section 422.100(m) also addresses disasters in which beneficiaries may be required to physically relocate outside an Medicare Advantage Organization's service area.

Plaintiffs say that the agency's explanation, in 2022, for not aligning the "criteria related to special emergency requirements with the conditions for the Star Rating Extreme and Uncontrollable Circumstances adjustment" was insufficient. *See* Pls. Mot. (ECF No. 10) at 31 (quoting 87 Fed. Reg. at 27805). As already noted, despite not doing so in its response to this specific comment, the agency has adequately explained the different purposes furthered by the special emergency requirements and the Extreme and Uncontrollable Circumstances rule. It is also irrelevant to Plaintiffs' challenge to the Extreme and Uncontrollable Circumstances rule what the agency said three years later, in response to another comment on another rule. This Court thus has no reason to assess whether the agency's 2022 statement satisfies the arbitrary and capricious standard, because Plaintiffs are not challenging the 2022 rule. Said differently: even if Plaintiffs are right that "CMS declined to provide any rationale" for not aligning the criteria underlying sections 422.100(m) and 422.166(i) when it revised section 422.100(m), that is no basis for finding section 422.166(i)—promulgated before the section 422.100(m) revision and the allegedly insufficient comment response—arbitrary and capricious. The explanation for the Extreme and Uncontrollable Circumstances rule should be assessed on its own terms, not based on an alleged failure to sufficiently respond to a comment on a different rule promulgated three years later.

C.     **Plaintiffs Cannot Show that Contracts Operating Under a Public Health Emergency Are "Similarly Situated" to Contracts Not Operating Under a Public Health Emergency.**

Plaintiffs' argument about alleged disparate treatment of similarly situated Medicare Advantage plans, Pl. Mot. (ECF No. 10) at 32-35) rests on a flawed premise: that a natural disaster accompanied by a Secretarial declaration of a public health emergency is similar to a disaster not

accompanied by such a declaration, and only the "subjective, discretionary decision-making of the Secretary" distinguishes them. *Id.* at 32.  Plaintiffs say this Court should look to the "severity and impact" of the "underlying weather event" in determining whether natural disasters are similar. *Id.*  Plaintiffs do not explain when and how weather events are comparable in severity and impact, or how (and by whom) that determination should be made.  Even if severity and impact may be relevant factors, they are not the only ones: a contemporaneous determination that a public health emergency exists by the principal officer vested by Congress with the authority to make such determinations is also a relevant factor.

Plaintiffs' proposed approach is not compelled by the statute.  In deciding whether to declare a public health emergency, the Secretary "consult[s] with such public health officials as may be necessary" and then determines whether "a disease or disorder presents a public health emergency; or [] a public health emergency . . . otherwise exists."  42 U.S.C. § 247d(a).  The statute says nothing about whether disasters of a certain "severity and impact" should or should not lead to declarations of a public health emergency; the sole question for the Secretary is whether a public health emergency exists.  As applied to natural disasters, this could rest on factors completely unrelated to weather severity; for example, if a tornado caused minimal generalized damage but struck the only hospital serving a rural area, the Secretary might determine that a public health emergency exists, even if tornadoes causing more general damage but harming less critical healthcare infrastructure might not constitute a public health emergency.

The record here shows that "Florida did not request a section 1135 waiver or an official public health emergency declaration most likely because they did not need outside resources to handle the disaster."  AR 391 (letter from Florida Blue Vice President, Government Relations). This indicates that the Secretary, consistent with the statute, consulted with relevant public health

officials and determined that there was no public health emergency.  Florida Blue does not challenge directly the Secretary's decision not to declare a public health emergency related to the Broward County Floods.  Instead, Plaintiffs complain that the "Secretary's decisions are entirely discretionary."  Pl. Mot. (ECF No. 10) at 35.  But from a constitutional perspective, vesting discretion in presidential appointees is a feature, not a bug.  "Assigning the nomination power to the President guarantees accountability for the employees' actions because the 'blame of a bad nomination would fall upon the president singly and absolutely.'"  *Arthrex*, 594 U.S. at 12 (quoting The Federalist No. 77, p. 517 (J. Cooke ed. 1961) (A. Hamilton)).  Before bringing this lawsuit, Plaintiffs asked lower agency officials to exercise discretion not granted by the regulations to deem the Broward County floods sufficiently akin to other disasters that the Extreme and Uncontrollable Circumstances Rule should apply.  *See* AR 391.  But the decision of whether a natural disaster creates a public health emergency is vested in a cabinet secretary, who can consult with relevant experts (at least some of whom apparently did not then believe that the Broward County flooding caused a public health emergency).  Even if natural disasters' "severity and impact" may be similar in some ways, Plaintiffs cannot show that natural disasters should always be treated identically for public health purposes broadly or Medicare program purposes specifically.  Worse, they would have this Court, rather than a politically accountable figure in the Executive Branch consulting with experts, make the decision about which disasters should result in Star Ratings adjustments.

The timing and nature of the federal disaster declarations in Broward County usefully illustrates why the requirement of a separate public health emergency declaration is integral to the Extreme and Uncontrollable Circumstances Rule.  The federal government made its disaster declaration for Broward County two weeks after the flooding began, and it announced that the declaration would make available assistance including "grants for temporary housing and home

repairs, low-cost loans to cover uninsured property losses, and other programs to help individuals and businesses recover from the effects of the disaster." FEMA press release, President Joseph R. Biden, Jr. Approves Major Disaster Declaration for Florida | FEMA.gov. These are an integral part of the recovery from the disaster, but they do not indicate that there was at the time of the major disaster declaration (or at the time of flooding itself two weeks earlier) a public health emergency. From a public health perspective, not all major disasters are alike. And it is hardly arbitrary and capricious for the Department of Health and Human Services to take into account indicia of public health impacts in crafting its policies governing regulatory exceptions available during natural disasters.

Grayscale Investments v. Securities and Exchange Commission, 82 F.4th 1239 (D.C. Cir. 2023), is inapposite. See Pl. Mot. (ECF No. 10) at 32-33. The D.C. Circuit in that case assessed "whether Grayscale demonstrated its product was similar across the relevant regulatory factors to" other products approved by the SEC. Grayscale, 82 F.4th at 1245. The Court held that Grayscale, like the other products, "track[s] the bitcoin market price" and that all the products "have identical surveillance sharing agreements" with the exchange on which bitcoins trade. Id. at 1246. The Court concluded that the SEC's "reasons for approving the [other products] seem to apply equally to Grayscale, but Grayscale's listing was denied." Id. at 1251.

Here, by contrast, Plaintiffs have shown at most that the Broward County flooding involved massive rainfall in a short time, much like two other disasters for which a public health emergency was declared. But they cannot show that there was an equivalent threat *to the public health* arising from each of those three disasters; indeed, the Presidentially-appointed and Senate-confirmed official vested with the discretion to make determinations regarding public health emergencies concluded that the Kentucky and Mississippi floods presented a public health emergency, and the

Broward County flooding did not.  Threat to the public health as determined contemporaneously by the Secretary of Health and Human Services is surely a "relevant regulatory factor," *Grayscale*, 82 F.4th at 1245, in determining whether to adjust the method for calculating Star Ratings for Medicare Advantage Organizations.  Under Plaintiffs' theory, Medicare Advantage plans should be eligible for certain beneficial retroactive adjustments arising from a natural disaster, even though the absence of a Secretarial declaration of a public health emergency means that direct providers of healthcare services in the affected area could not receive regulatory waivers.  *See* 42 U.S.C. § 1320b-5 (waivers available upon declaration of a public health emergency).  Plaintiffs have not made the required showing that conditioning modification of the Star Ratings calculation method on a contemporaneously declared public health emergency is "arbitrary and capricious," or that natural disasters for which there is a declared public health emergency are identical to those that do not lead to a public health emergency declaration.

## II.    The Requirement of a Public Health Emergency Declaration to Trigger the Extreme and Uncontrollable Circumstances Rule is Not Severable.

As demonstrated above, the agency did not act arbitrarily and capriciously in conditioning the application of the Extreme and Uncontrollable Circumstances provision on a Secretarial declaration of a public health emergency.  This Court therefore does not need to conduct a severability analysis, because no portion of the rule is arbitrary and capricious.  However, if this Court does determine that the Section 1135 provisions of the rule are arbitrary and capricious, it should not rewrite the rule as Plaintiffs propose.

"Whether the offending portion of a regulation is severable depends on the intent of the agency *and* upon whether the remainder of the regulation could function sensibly without the stricken provision."  *MD/DC/DE Broadcasters Ass'n v. F.C.C.*, 236 F.3d 13, 22 (D.C. Cir. 2001) (emphasis in original).    Agencies can express their intent with respect to severability by

incorporating severability clauses, though the Supreme Court has cautioned that "a severability clause is an aid merely, not an inexorable command."  *Whole Women's Health v. Hellerstedt*, 579 U.S. 582, 625 (2016) (internal quotation marks omitted); *accord. New York v. Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475, 577 (S.D.N.Y. 2019) (challenge to HHS rule with severability clause).  This rule contains no severability clause, and while this fact is not dispositive on the agency's intent, there is no evidence that CMS would have promulgated the rule as Plaintiffs propose without the section 1135 waiver requirement.

Indeed, the opposite is true.  Among CMS's goals in promulgating the Extreme and Uncontrollable Circumstances Rule was to "avoid over-adjustment or adjustments that are unnecessary."  84 Fed. Reg. at 15770.  And in response to a commenter suggesting that the multiple criteria for application of the Rule might be "too restrictive," CMS explained that its reliance on multiple criteria "ensures that the extreme and uncontrollable circumstances policy is limited to contracts that may have experienced a real impact from the disaster in terms of operations or ability to serve enrollees."  *Id.* at 15772.  Were the agency's intent to not require a public health emergency declaration before the Rule is triggered, it could have modified its rule in response that comment.  That it did not do so clearly expresses the agency's intent.

The cases Plaintiffs cite, Pl. Mot. (ECF No. 10) at 38, do not mandate a contrary result.  In *North Carolina v. E.P.A.*, the D.C. Circuit refused to sever any portion of the challenged regulation, concluding that it "is a single, regional program, as EPA has always maintained, and all its components must stand or fall together."  531 F.3d 896, 929 (D.C. Cir. 2008).  In *National Association of Manufacturers v. N.L.R.B.*, the court determined that Subpart A of a rule was severable from Subpart B based on specific statements in the federal register.  846 F. Supp. 2d 34, 62 (D.D.C. 2012).  Here, by contrast, Plaintiffs do not acknowledge the agency's stated desire to

have the rule not apply too broadly, and they ask this Court to rewrite a provision in the Code of Federal Regulations to excise the parts that Plaintiffs allege are arbitrary and capricious. *See* Pl. Mot. (ECF No. 10) at 37-38. Similarly, *Davis County Solid Waste Management v. E.P.A.* involved agency standards governing two different entities that were "not in any way intertwined." 108 F.3d 1454, 1459 (D.C. Cir. 1997) (internal quotation marks omitted). These cases do not justify the relief Plaintiffs seek.

Plaintiffs point out, correctly, that the Extreme and Uncontrollable Circumstances rule reflects the agency's effort to codify, with slight modifications, previously-existing agency guidance. *See* Pl. Mot. (ECF No. 10) at 39-40. But that fact does not imply that the requirement of a public health emergency declaration is severable from the rest of the rule. Indeed, as noted above, the reference to "multiple disasters in 2017 and 2018, including several hurricanes and wildfires," 84 Fed. Reg. at 15,821, shows that the agency was looking at historical disasters for which there was an accompanying public health emergency declaration. There is no indication that the agency would have adopted a rule that resulted in substantially more contracts qualifying for the Extreme and Uncontrollable Circumstances Rule. And if the Court deems the rule in its current form arbitrary and capricious, it should be the agency—and not the Court—that decides how to modify the rule.

It is similarly far from obvious that the Rule would "function sensibly" without the requirement of a public health emergency declaration. The rule as modified by Plaintiffs would potentially provide relief to Medicare Advantage Organizations operating in disaster areas where direct providers of services cannot obtain regulatory waivers. *See supra*. As already described, Plaintiffs' comparison to the separate rule at 42 C.F.R. § 422.100(m) is inapt because that rule does not serve the same purposes as the Extreme and Uncontrollable Circumstances Rule.

**III.    If The Court Orders Any Remedy, Remand Without Vacatur Is Proper, and Florida Blue's Requested Individual Relief Is Untenable.**

**A.    If This Court Finds Error, It Should Remand Without Vacatur.**

Were the Court to conclude—contrary to Defendants' arguments—that the Extreme and Uncontrollable Circumstances rule is arbitrary and capricious, the appropriate relief would be a remand without vacatur to the Secretary "for further action consistent with [the court's] opinion." *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005).  A court can choose to vacate a rule in conjunction with remanding it only after it has conducted a vigorous analysis of the propriety of doing so by examining both the seriousness of the alleged flaw in the rule and the potentially disruptive consequence of vacatur. *Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993).  A recent decision by the D.C. Circuit says that remand without vacatur is permitted "if an agency's error is curable." *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024) (internal quotations omitted).  Under any formulation, remand without vacatur is appropriate here.

Plaintiffs do not argue that the Extreme and Uncontrollable Circumstances Rule violates any statute, and they explicitly urge this Court to maintain the portions of the rule with which they agree.  Plaintiffs claim that the rule's fault lies in its requirement of a declared public health emergency before it applies, or a disconnect between the agency's purpose in promulgating the rule and the rule itself, or a failure by the agency to articulate a satisfactory explanation in response to a comment.  These claims lack merit, but in any event, they do not raise serious flaws with the rule.  Vacatur, moreover, might cause disruptive consequences.  Other contracts did qualify for modification of their Star Ratings calculation methods based on the Extreme and Uncontrollable Circumstances Rule.

Plaintiffs themselves acknowledge that any error is curable by urging this Court to rewrite the rule.  Pl. Mot. (ECF No. 10) at 37-38.  A Court may not do so, and the agency should have the opportunity to cure any deficiencies the Court finds in the rule in the first instance.

### B. Plaintiff-Specific Relief Is Inappropriate.

Florida Blue argues that, but for the requirement in the Extreme and Uncontrollable Circumstances Rule that a public health emergency be declared before the rule can apply, it would have had 26% of enrollees in its two contracts residing in areas covered by the Extreme and Uncontrollable Circumstances Rule.  Defendants do not dispute this.  However, that does not mean that this Court may craft a remedy that is specific to Florida Blue.  *See* Pl. Mot. (ECF No. 10) at 42 ("this Court may issue plaintiff-specific relief as to [Florida Blue] alone").

Plaintiff-specific relief would be inconsistent with the Extreme and Uncontrollable Circumstances rule, including the portions that Plaintiffs want to preserve.  The Rule applies a series of verifiable criteria (a major disaster declaration under the Stafford Act, the exercise of Secretarial authority under Section 1135, and a minimum percentage of enrollees residing in a FEMA-designated individual assistance area) to determine whether a contract is affected and warrants an adjustment.  Plaintiffs would have this Court craft an individualized remedy based on only one of those criteria (the number of enrollees residing in a FEMA-designated disaster area) plus a judicial determination that the Broward County flooding was sufficiently serious to deem the challenged contracts affected.  But the APA does not permit this sort of relief, and Plaintiffs do not argue otherwise.  *See* 5 U.S.C. § 706.

*    *    *

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion and grant Defendants'

Motion.

Dated: March 18, 2025                          Respectfully submitted,

                                               EDWARD R. MARTIN, JR., D.C. Bar #481866
                                               United States Attorney


                                               By:  _____/s/ M. Jared Littman_____
                                                    M. JARED LITTMAN
                                                    Assistant United States Attorney
                                                    601 D Street, NW
                                                    Washington, DC 20530
                                                    (202) 252-2523

                                               *Attorneys for the United States of America*

OF COUNSEL:

SEAN R. KEVENEY
    Acting General Counsel

LENA YUEH
    Acting Associate General Counsel

DAVID L. HOSKINS
    Deputy Associate General Counsel for Litigation

ALEXANDER R. WHITE
    Attorney

*U.S. Department of Health and Human Services*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BLUE CROSS AND BLUE SHIELD OF FLORIDA, INC., *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al*.,<br><br>        Defendants. | Civ. A. No. 24-3609 (APM) |

## **[PROPOSED] ORDER**

UPON CONSIDERATION of Defendants' Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment, and the entire record herein, it is hereby

ORDERED that Defendants' cross-motion is GRANTED, and it is further

ORDERED that Plaintiffs' motion is DENIED.


SO ORDERED:


_____                    _____
Date                                       AMIT P. MEHTA
                                           United States District Judge