**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| BLUE CROSS AND BLUE SHIELD OF FLORIDA, INC., et al., | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 24-cv-03609 (APM) |
| DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | ) ) ) ) | |
| Defendants. | ) ) ) | |

**<u>MEMORANDUM OPINION</u>**

## I.  INTRODUCTION

Plaintiffs Blue Cross and Blue Shield of Florida, Inc. and Florida Blue Medicare, Inc. bring this suit under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, against Defendants Department of Health and Human Services ("HHS"), Centers for Medicare & Medicaid Services ("CMS"), and the heads of those agencies.[1] Plaintiffs challenge the Extreme and Uncontrollable Circumstances Rule, 42 C.F.R. §§ 422.166(i), 423.186(i), which allows Medicare insurance plans to avoid a reduction of their "Star Ratings" when "extreme and uncontrollable circumstances" negatively affect operational and clinical systems. Every year, CMS rates Medicare insurance plans on a one- to five-star scale to reflect a plan's quality of care and services. Plaintiffs contend that the Extreme and Uncontrollable Circumstances Rule is arbitrary and capricious because, to qualify for ratings relief, the Secretary of Health and Human Services ("Secretary") must declare a public health emergency and waive certain requirements,

---

[1] The court automatically substitutes as Defendants the current Secretary of HHS, Robert F. Kennedy, Jr., and the current Administrator of CMS, Dr. Mehmet Oz. *See* Fed. R. Civ. P. 25(d).

two conditions that cannot be reconciled with the Rule's purpose.  Further, Plaintiffs claim that the Extreme and Uncontrollable Circumstances Rule is at odds with other CMS rules about Medicare plan requirements during natural disasters and leads to dissimilar treatment of similarly situated Medicare plans.

The parties have cross-moved for summary judgment.  For the reasons explained below, the Court denies Plaintiffs' Motion for Summary Judgment, ECF No. 10, and grants Defendants' Cross-Motion for Summary Judgment, ECF No. 12.

## II.    BACKGROUND

### A.    Statutory and Regulatory Background

#### 1.    Medicare and Star Ratings

Medicare is a federal program that provides health insurance benefits for elderly and disabled Americans.  *See* 42 U.S.C. § 1395 *et seq.*  The Medicare program is administered by CMS, a component of HHS.  *Elevance Health, Inc. v. Becerra*, 736 F. Supp. 3d 1, 4 (D.D.C. 2024) (citing *Johnson v. Becerra*, 668 F. Supp. 3d 14, 17 (D.D.C. 2023)).  Medicare is divided into four different parts—"Parts A and B of the program make up the traditional Medicare system under which CMS directly reimburses healthcare providers."  *Id.* (citing 42 U.S.C. §§ 1395c, 1395j).  Parts C and D "permit individuals to receive their Medicare benefits through private insurers."  *Id.*  Part C is known as "Medicare Advantage," or "MA," and it allows Medicare recipients to opt into private insurance paid for, or at least subsidized by, the government.  42 U.S.C. § 1395w-21; *UnitedHealthcare Ins. Co. v. Becerra*, 16 F.4th 867, 872 (D.C. Cir. 2021).  Lastly, Part D creates prescription drug plans ("PDPs"), which "offer[] subsidized prescription drug insurance coverage . . . to beneficiaries who enroll in traditional or Part C plans."  *Elevance Health*, 736 F. Supp. 3d at 4 (citing 42 U.S.C. § 1395w-101(a)(1)).

MA insurers "receive in advance a monthly lump sum from CMS for every beneficiary that they enroll, without regard to the services that the beneficiaries will actually receive." *United Healthcare*, 16 F.4th at 873; *see* 42 U.S.C. § 1395w-23(a)(1)(A), (C).   Related to this payment structure, MA plans submit a bid representing their overall estimated costs in providing Medicare benefits to members for the coming year.   42 U.S.C. § 1395w-23(a)(1)(B); 42 C.F.R. § 422.254; *see also United Healthcare*, 16 F.4th at 873–76.  If the bid submitted by the MA plan is lower than a benchmark set by CMS based on traditional Medicare spending per enrollees, CMS returns a portion of the savings to the plan as a "rebate," which it can then use to fund additional benefits or reduce premiums.   *See* 42 U.S.C. §§ 1395w-23(a)(1)(E), (n), 1395w-24(b)(1)(C); 42 C.F.R. §§ 422.258, 422.260.

Each year, CMS rates MA plans and PDPs on a scale of one to five stars based on data collected by CMS.   42 U.S.C. § 1395w-23(o)(4)(A); *see also id.* § 1395w-22(e)(3).   The "Star Ratings" system "is designed to provide information to the beneficiary that is a true reflection of the plan's quality and encompasses multiple dimensions of high quality care." *Medicare Program; Contract Year 2019 Policy and Technical Changes*, 83 Fed. Reg. 16,440, 16,519 (Apr. 16, 2018) (codifying the regulatory framework for Star Ratings).  Prospective Medicare plan members may view the ratings online in the Medicare Plan Finder, which displays all plans available to the Medicare beneficiary and their Star Rating.  *See* 42 C.F.R. §§ 422.166(h), 423.186(h).

CMS also ties plan ratings to financial incentives through the Quality Bonus Payment program.  First, plans rated four stars or higher are given an increased benchmark against which to bid, which in turn may increase the rebate they receive.  42 U.S.C. §§ 1395w-23(o)(1), (3)(A)(i), 1395w-24(b)(1)(C); 42 C.F.R. § 422.260.  Second, higher-rated plans can keep a larger portion of the difference between their bid and benchmark as a rebate.  Plans at or above 4.5 stars retain 70%

of the difference as a rebate, plans rated at least 3.5 stars but less than 4.5 stars retain 65%, and plans at or below 3.5 stars retain only 50%.  See 42 U.S.C. § 1395w-24(b)(1)(C)(v); 42 C.F.R. § 422.266(a)(2)(ii).  Finally, a plan that consistently receives Star Ratings below three stars may be terminated from the Medicare program.  See 42 C.F.R. §§ 422.510(a)(4)(xi), 423.509(a)(4)(x).

Star Ratings are calculated based on various quality and performance "measure[s]"—30 in number for MA plans and 12 for PDPs—that attempt to capture clinical outcomes, patient experience, and plan operations.  See CMS, *Medicare 2025 Part C & D Star Ratings Technical Notes* 1, 5 (Oct. 3, 2024), https://www.cms.gov/files/document/2025-star-ratings-technical-notes.pdf [hereinafter 2025 Technical Notes].  Each measure is assigned a numerical value and CMS then converts that numerical score into a measure-specific rating.  *See Elevance Health*, 736 F. Supp. 3d at 7.  Those measure-specific ratings are then used on a weighted basis to calculate the overall Star Rating.  *See id.*  Thus, changes in underlying performance data can have a large impact on a plan's Star Rating.

2.      The Extreme and Uncontrollable Circumstances Rule

In 2019, CMS adopted the Extreme and Uncontrollable Circumstances Rule (the "Rule"), codified at 42 C.F.R. § 422.166(i) (for Part C plans) and 42 C.F.R. § 423.186(i) (for Part D plans), to ensure equitable treatment of MA plans and PDPs adversely affected by natural disasters and other extraordinary events.[2]  Under the Rule, CMS may adjust a plan's Star Rating when an event beyond the plan's control materially disrupts its ability to deliver care or meet other performance metrics.  *See* Joint App'x, ECF No. 17 [hereinafter JA], at RR-0026097 (noting in the final rule that extreme and uncontrollable circumstances "may negatively affect the underlying operational

---

[2] *See Medicare and Medicaid Programs; Policy and Technical Changes to the Medicare Advantage, Medicare Prescription Drug Benefit, Programs of All-Inclusive Care for the Elderly (PACE), Medicaid Fee-For-Service, and Medicaid Managed Care Programs for Years 2020 and 2021*, 84 Fed. Reg. 15,680, 15,770–72 (Apr. 16, 2019): *see also* Joint App'x, ECF No. 17, at RR-0026097–101 (relevant part copied in Joint Appendix).

4

and clinical systems that CMS relies on for accurate performance measurement in the Star Ratings program, all without fault on the part of the MA organization or Part D plan sponsor"). CMS sought "[t]o ensure that the Star Ratings adjustments focus on the specific geographic areas that experienced the greatest adverse effects from the extreme and uncontrollable circumstance and are not applied to areas sustaining little or no adverse effects." *Id.* at RR-0000044 (proposed rule); *see also id.* at RR-0026097 (noting in the final rule that CMS wanted "the adjustments [to] be tailored to the specific areas experiencing the extreme and uncontrollable circumstance in order to avoid over-adjustment or adjustments that are unnecessary").

To qualify as an "affected contract" under the Rule, a plan must satisfy three conditions: (1) the contract's service area must be designated an "emergency area" during an "emergency period" under Section 1135(g) of the Social Security Act; (2) the President must declare a major disaster under the Stafford Act, 42 U.S.C. § 5170, and the Secretary must exercise waiver authority under Section 1135 based on the same event; and (3) a minimum percentage of the contract's enrollees must reside in a Federal Emergency Management Authority ("FEMA")-designated Individual Assistance area. *See* 42 C.F.R. §§ § 422.166(i)(1), 423.186(i)(1); JA at RR-0000044 (listing these prerequisites in the proposed rule); *see also id.* at RR-0026098–99 (adopting the prerequisites in the final rule).

With respect to the first two conditions, under Section 1135(g) of the Social Security Act, "an 'emergency area' is a geographical area in which, and an 'emergency period' is the period during which, there exists": (1) a Presidential declaration of an emergency or disaster under the Stafford Act, 42 U.S.C. §§ 5170, 5191, or the National Emergencies Act, 50 U.S.C § 1621, *and* (2) the Secretary declares a "public health emergency" pursuant to 42 U.S.C. § 247d. *See* 42 U.S.C. § 1320b-5(g) (codification of Section 1135(g)). When both conditions are satisfied, the Secretary

is authorized to temporarily waive or modify certain Medicare requirements to ensure sufficient health care services are available to meet the needs of individuals. *See id.* § 1320b-5(a), (b). Thus, although the Rule does not mention public health emergencies, its application is predicated on the declaration of one given the statutory prerequisites.

As to the third criterion, a FEMA-designated Individual Assistance area is a geographic area in which FEMA administers federal assistance once the President declares a major disaster or emergency under the Stafford Act. *See* 42 U.S.C. § 5174; Exec. Order No. 12,673, 54 Fed. Reg. 12,571 (Mar. 23, 1989); 44 C.F.R. §§ 206.1 *et seq.* CMS looks to the aggregate affected enrollee population for a Part C or D plan in all affected areas in a given year to determine whether the applicable "minimum percentage" of enrollees in a FEMA-designated Individual Assistance area has been satisfied. *See* 2025 Technical Notes, Attach. P. The minimum percentage is either 25% or 60% depending on the type of Star Ratings adjustment. *See* 42 C.F.R. §§ § 422.166(i)(1)(iii), 423.186(i)(1)(iii). If a plan's enrollees are impacted by two extreme and uncontrollable disaster events in a single year, CMS uses the combined percentage of the affected population to determine whether the final condition of the Rule is met. *See* 2025 Technical Notes, Attach. P, at 175–77.

## B.    The Broward County Floods and Hurricane Idalia

In mid-April 2023, a massive rainstorm struck Broward County, Florida. On April 12 alone, over 25 inches of rain fell on the area. *See* Florida Exec. Order No. 23-65 at 1 (Apr. 13, 2023), https://www.flgov.com/eog/sites/default/files/executive-orders/2024/EO-23-65-1.pdf.[3] Due to flooding, Florida Governor Ron DeSantis declared a state of emergency. *See id.* On April 27, 2023, President Joseph R. Biden declared that a major disaster existed under the Stafford Act

---

[3] The court takes judicial notice of this and other information on government websites only for background purposes. *See* Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

in the State of Florida. *See Florida; Major Disaster and Related Determinations*, 88 Fed. Reg. 34,883, 34,884 (May 31, 2023); The White House, *President Joseph R. Biden Jr. Approves Florida Disaster Declaration* (Apr. 28, 2023), https://bidenwhitehouse.archives.gov/briefing-room/presidential-actions/2023/04/28/president-joseph-r-biden-jr-approves-florida-disaster-declaration-3/. President Biden's proclamation also declared Broward County a FEMA-designated Individual Assistance area. *See* 88 Fed. Reg. at 34,884. Then-Secretary of HHS Xavier Becerra did not, however, declare a public health emergency for Broward County. With that precondition unsatisfied, no Section 1135 waiver issued. *See* JA at AR00391 (Plaintiffs stating in an email to CMS that they "were informed that the State of Florida did not request a [S]ection 1135 waiver or an official public health emergency declaration").

Later that same year, in August 2023, Hurricane Idalia hit Florida. President Biden again declared that a major disaster existed under the Stafford Act in certain counties, designating them for FEMA Individual Assistance. *See* FEMA, *President Joseph R. Biden, Jr. Approves Major Disaster Declaration for Florida* (Aug. 31, 2023), https://www.fema.gov/press-release/20230831/president-joseph-r-biden-jr-approves-major-disaster-declaration-florida. This time, Secretary Becerra determined that a public health emergency existed "[a]s a result of the consequences of Hurricane Idalia on the State of Florida." *See* Admin. for Strategic Preparedness & Response*, Determination that a Public Health Emergency Exists* (Aug. 30, 2023), https://aspr.hhs.gov/legal/PHE/Pages/Florida-Hurricane-Idalia-Aug2023.aspx. A Section 1135 waiver followed. *See* JA at AR00312.

### C.    Plaintiffs' Reduced Star Rating

Plaintiffs are insurers who offer health care plans under Part C and Part D in Florida. *See* Compl., ECF No. 1, ¶¶ 31–33. They claim that if CMS had issued an extreme and

uncontrollable circumstance adjustment for the Broward County flooding, their Star Ratings for Calendar Year 2025 would be higher.  *See id.* ¶¶ 100–02.

Each year, CMS publishes an "Advance Notice of Methodological Changes" as part of the process of determining Star Ratings.  *See* JA at AR00311–13.  The Notice contains information regarding natural disasters that may qualify for a Star Ratings Adjustment under the Rule, including a list of Section 1135 waivers.  *See* JA at AR00312.  For the Calendar Year 2025 Advance Notice, issued on January 31, 2024, Hurricane Idalia appears on the list of waivers, but the Broward County floods do not because the Secretary neither declared a public health emergency nor issued a Section 1135 waiver.  *Id.*; *see also* CMS, *Advance Notice of Methodological Changes for Calendar Year (CY) 2025 for Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies* 117–19 (Jan. 31, 2024), https://www.cms.gov/files/document/2025-advance-notice.pdf.

After the Advance Notice issued, Plaintiffs contacted CMS in February 2024 to inquire why a waiver had not issued for the Broward County flooding.  JA at AR00381–82. CMS responded by reiterating the prerequisites for an affected contract and providing a link to the Section 1135 waivers for the applicable time period.  *Id.* at AR00381.  Plaintiffs contacted CMS again in March 2024, this time presenting data that the Broward County floods might have affected the individual measure scores impacting their Star Ratings.  *Id.* at AR00385–86.  Plaintiffs requested that CMS effectively treat the Broward County flooding as qualifying under the Rule, despite the non-issuance of a Section 1135 waiver.  *Id.* at AR00391.  CMS responded that it was "required to follow the methodology codified in regulation so" it could not "make exceptions in how [it] administer[s] the disaster policy for Star Ratings."  *Id.* at AR00390.  Plaintiffs contacted

CMS again in September 2024, requesting a one-time exception to the Rule, which CMS again declined. *Id.* at AR00393–94.

Plaintiffs made one more attempt in November 2024, requesting a Star Ratings adjustment based on the Broward County flooding. JA at AR00395. It argued that "CMS's refusal to make an adjustment in this situation places form over substance," as the flooding "is exactly the type of event for which a Star Ratings adjustment is necessary." *Id.* at AR00396. Plaintiffs argued that requiring a Section 1135 waiver "frustrates Star Ratings objectivity by arbitrarily inserting multiple layers of subjectivity into the calculation," reliant solely on the Secretary's discretion. *Id.* This was particularly true in the case of the Broward County flooding, as both President Biden and Governor DeSantis recognized the event as an emergency. *Id.* at AR00396–97. CMS declined Plaintiff's final request in December 2024 on the same grounds as before. *Id.* at AR00398–99.

### D.    Procedural History

Plaintiffs filed this action on December 27, 2024, asserting three claims under the Administrative Procedure Act. First, they assert that the Rule "is facially arbitrary and capricious . . . because its application is dependent on subjective and discretionary decisionmaking of the Secretary that needs not bear any relationship to the demonstrable impacts that extreme weather events and natural disasters actually have on Medicare plans." Compl. ¶ 117. Second, Plaintiffs maintain that conditioning a Star Ratings adjustment in this case on a Section 1135 waiver was arbitrary and capricious "because it is internally inconsistent with [42 C.F.R] § 422.100(m) and because it causes Florida Blue to be treated differently than similarly situated Medicare plans that qualify for a Star Rating adjustment" based on the Secretary's subjective decision to declare a public health emergency in different geographic areas for like-weather events or natural disasters.

*Id.* ¶ 124.  Third, Plaintiffs also challenge their Star Ratings for 2025 as arbitrary and capricious because they "rely on the arbitrary aspects" of the Rule.  *Id.* ¶ 127.

Plaintiffs moved for summary judgment on their claims, and Defendants cross-moved to uphold the Rule against the challenge.  *See* Pls.' Mot. for Summ. J., ECF No. 10 [hereinafter Pls.' Mot.]; Defs.' Opp'n to Pls.' Mot. and Cross-Mot. for Summ. J., ECF No. 12 [hereinafter Defs.' Cross-Mot.].  Both motions are now ripe.

## III.    LEGAL STANDARD

In cases that involve review of a final agency action under the APA, the district court "sits as an appellate tribunal," and "[t]he entire case on review is a question of law."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotation marks and citations omitted).  The court's review is limited to the administrative record, and "its role is limited to determining whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Philip Morris USA Inc. v. FDA*, 202 F. Supp. 3d 31, 45 (D.D.C. 2016) (cleaned up).

Under the APA, an agency action may be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The arbitrary-and-capricious standard is "highly deferential" and "presumes the validity of agency action."  *Nat'l Ass'n of Clean Air Agencies v. EPA.*, 489 F.3d 1221, 1228 (D.C. Cir. 2007) (internal quotation marks and alteration omitted).  But an agency rule is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,

463 U.S. 29, 43 (1983).  The agency must therefore engage in reasoned analysis, which exists
when the administrative record indicates it "examine[d] the relevant data and articulate[d] a
satisfactory explanation for its action including a 'rational connection between the facts found and
the choice made.'"  *Id.* at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156,
168 (1962)).  "Additionally, an agency may not treat like cases differently." *Eagle Broad. Grp.,
Ltd. v. F.C.C.*, 563 F.3d 543, 551 (D.C. Cir. 2009) (internal quotation marks and citation omitted).

IV.    ANALYSIS

    A.    **Count I: "Facial Challenge" to the Rule**

    The crux of Plaintiffs' first challenge is this: The Rule does not accomplish the objective
that CMS articulated in promulgating it, which is to ensure that MA plans and PDPs are not
punished in their Star Ratings for circumstances beyond their control.  The Rule fails to meet its
objective, Plaintiffs contend, because it is keyed to the Secretary issuing a waiver under
Section 1135, which itself requires the Secretary to have made a public health emergency
declaration.  *See* Pls.' Mot., Mem. of P&A in Supp., ECF No. 10-1 [hereinafter Pls.' Mem.], at 25–
31.  Plaintiffs contend that these two prerequisites are "arbitrary and practically useless gating
mechanisms," as "the Secretary is under no obligation to do either of those things, *no matter how
severe the disaster or emergency*."  *Id.* at 25.

    Plaintiffs' argument, however, overlooks that CMS did not intend for the Rule to create a
broad exception for Star Ratings adjustments.  Rather, CMS sought to ensure that only a narrow
set of the most affected contracts benefited from the Rule.  In the original proposed rulemaking,
CMS observed that "[e]xtreme and uncontrollable circumstances such as natural disasters can
directly affect Medicare beneficiaries and providers, as well as the Parts C and D organizations
that provide them with important medical care and prescription drug coverage."   JA at RR-

0000044. It thus recognized that a Star Rating could decline "without fault on the part of the" MA plan or PDP. *Id.* Yet, CMS explicitly sought "to target the adjustments to specific contracts and to further specify and limit the adjustments[,]" as it wanted "[t]o ensure that the Star Ratings adjustments focus on the *specific geographic areas* that experienced *the greatest adverse effects* from the extreme and uncontrollable circumstance and are not applied to areas *sustaining little or no adverse effects*." *Id.* (emphasis added).

CMS reiterated this goal in response to comments during the rulemaking process. One commenter was "unclear on whether criteria #s 1 and 2," *i.e.,* the prerequisites that, at bottom, require a declaration of a public health emergency by the Secretary, "require a state-level declaration of emergency to qualify selected geographies and contracts as eligible for adjustment." JA at RR-0000627 (comment of RXAnte). If so, the commenter argued, those requirements were "too restrictive," as the commenter believed that "criteria #3 (minimum percentage of enrollees residing in a FEMA-designated Individual Assistance Area) is most applicable to accurately identify the impact of an uncontrollable event." *Id.* CMS responded that under the Stafford Act, "disaster declarations are made by state but designate specific counties that are affected," and further noted that it required affected contracts to meet all three listed criteria to ensure that the "policy is limited to contracts that may have experienced a real impact from the disaster in terms of operations or ability to serve enrollees" and "that it applies only when the event is extreme, meriting the use of special adjustments to the Star Ratings." JA at RR-0026099.[4]

---

[4] Plaintiffs argue that CMS provided a "non-answer" when confronted with the above comment. Pls. Combined Reply in Supp. of Pls.' Mot. & Mem. of P&A in Opp'n to Defs.' Cross-Mot., ECF No. 13 [hereinafter Pls.' Opp'n], at 6–7; see also Pls.' Mem. at 29–30. The court disagrees. An agency need only respond to a comment to "enable [a court] to see what major issues of policy were ventilated and why the agency reacted to them as it did." *Delaware Dep't of Nat. Res. & Env't Control v. E.P.A.*, 785 F.3d 1, 15 (D.C. Cir. 2015) (internal quotation marks and alteration omitted). CMS's response satisfied that standard. CMS responded with information about state-level disaster declarations and reiterated that the Rule applied only to the most affected contracts. CMS was not required to say more.

Given the Rule's narrow purpose, it was not arbitrary and capricious for CMS to tie the Rule's application to the Secretary's discretionary declaration of a public health emergency. That condition is consistent with the statutory scheme. The purpose of a Section 1135 waiver is to ensure "that sufficient health care items and services are available to meet the needs of individuals" in an "emergency area during an emergency period" and "that health care providers . . . that furnish such items and services in good faith . . . may be reimbursed for such items and services and exempted from sanctions for such noncompliance[.]" 42 U.S.C. § 1320b-5(a). Congress defined "emergency area" and "emergency period" in part based on the declaration of a public health emergency by the Secretary. *See id.* § 1320b-5(g)(1). Section 1135 vests broad discretion in the Secretary. *See Alliance v. Becerra*, No. 23-cv-2168, 2024 WL 4006049, at *2 (D.D.C. Aug. 30, 2024) (Congress "granted the Secretary the authority to waive certain Medicare regulations during national emergencies."). It authorizes the Secretary to waive or modify "the requirements of subchapters XVIII, XIX, or XXI, or any regulation thereunder" pertaining to a range of program requirements and actions. 42 U.S.C. § 1320b-5(b). The Star Ratings system is codified in subchapter XVIII. *See id.* § 1395w-23(o)(4)(A). Thus, Congress itself determined that there was a connection between declared public health emergencies and modifying a plan's quality rating under the Star Ratings system. It therefore was not arbitrary and capricious for CMS to condition the Rule's application on the Secretary's exercise of authority under Section 1135, to include declaring a public health emergency.

Plaintiffs fail to grapple with the statutory connection between the Star Ratings system, Section 1135, and the Secretary's power to declare a public health emergency. Instead, they argue that the Rule is arbitrary and capricious because the provision that authorizes the Secretary to declare a public health emergency has a "narrower focus." Pls.' Mem. at 28. Specifically, its

invocation requires a determination that "a disease or disorder presents a public health emergency" or "a public health emergency . . . otherwise exists."   42 U.S.C. § 247d.   "This extreme misalignment," Plaintiffs contend, "underscores that the Secretary's decision does not bear a direct relation to the severity of an extreme and uncontrollable event, or to the problem that CMS set out to address."  Pls.' Mem. at 29.

But there is no "misalignment," let alone one that is arbitrary and capricious, between requiring a declaration of a public health emergency and affording special relief from a ratings reduction due to an "extreme and uncontrollable event."  The Rule was not meant to cover *any* natural disaster that might have some adverse ratings effect.  Rather, it was meant to extend only to those plans that "may have experienced a real impact from the disaster in terms of operations or ability to serve enrollees."  JA at RR-0026099.  Thus, limiting the Rule's reach only to those extreme and uncontrollable circumstances with attendant public health consequences is not irrational.  Plaintiffs' contrary position asks the court to do what it cannot: "substitute its judgment for that of the agency."  *State Farm*, 463 U.S. at 43.

Plaintiffs point out that the final rule states that CMS "proposed to narrow [the Rule] to apply to contracts with a certain minimum percentage of enrollees residing in an area declared as an Individual Assistance area because of the *disaster declaration*."  JA at RR-0026098 (final rule) (emphasis added); *see also id.* at RR-0000045 (proposed rule).  Grasping onto the term "disaster declaration," Plaintiffs argue that "CMS recognized and announced at the time of rulemaking that it is the Stafford Act disaster declaration in combination with the FEMA Individual Assistance that . . . supplies the appropriate proxy."  Pls.' Opp'n at 13.  Plaintiffs read too much into this one sentence.  In referring to a "disaster declaration," CMS did not disclaim Section 1135's other requirements as appropriate "proxies."  Indeed, the very same paragraph starts by reiterating all

three prerequisites as necessary for a Star Ratings adjustment.  *See* JA at RR-0026098.  CMS's decision to require a Section 1135 waiver—including the predicate declared public health emergency—as a prerequisite to an adjustment under the Rule was not arbitrary and capricious.

In their reply brief, Plaintiffs contend that CMS improperly defends the Rule based on a rationale different than at the time of the Rule's promulgation.  *See S.E.C. v. Chenery Corp.*, 318 U.S. 80, 95 (1943).  According to Plaintiffs, "CMS did not explain then, as Defendants do now, that everything was dependent on findings by the Secretary resulting in the declaration of a public health emergency."  Pls.' Opp'n at 19.  But CMS did not have to so explain.  The Rule itself makes that clear by incorporating as preconditions both that the contract's service area be designated an "emergency area" during an "emergency period" under Section 1135(g) and that the Secretary issue a Section 1135 waiver, both of which require the Secretary's declaration of a public health emergency.  CMS was not required to spell out what the text of the Rule makes clear.  That the commentary accompanying the Rule does not mention the words "public health emergency" therefore is not fatal.  Pls.' Opp'n at 19.

In sum, CMS did not act arbitrarily and capriciously in determining that a Section 1135 waiver and a public health emergency declaration was required before a Star Ratings adjustment could issue for an extreme and uncontrollable circumstance.  The agency's "rationale," though "concise," was "discernable and therefore adequate."  *Sierra Club v. FERC*, 97 F.4th 16, 29 (D.C. Cir. 2024) (citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974)).  The court declines to disturb what is essentially a policy judgment by CMS.

**B.**     **Count II: "As-Applied" Challenge**

*1.     Purported Inconsistency with 42 C.F.R. § 422.100(m)*

Plaintiffs also attempt to establish arbitrary and capricious decision-making by comparing

the Rule's restrictive approach to a different provision, 42 C.F.R. § 422.100(m).  CMS imposes

additional requirements on MA plans to ensure that enrollees continue to receive access to care in

the event of a national emergency.  *See* 42 C.F.R. § 422.100(m); *see also Medicare Program;*

*Contract Year 2023 Policy and Technical Changes to the Medicare Advantage and Medicare*

*Prescription Drug Benefit Programs*, 87 Fed. Reg. 27,704, 27,706 (May 9, 2022).  To trigger those

requirements, there must be a presidential declaration of a disaster or emergency under the Stafford

Act or National Emergencies Act; a public health emergency declaration by the Secretary; *or* a

disaster declaration by the governor of the affected state.  42 C.F.R. § 422.100(m)(2).  Thus, unlike

the Rule, Section 422.100(m), which imposes *burdens* on MA plans in case of a national

emergency, is worded in the disjunctive and thereby covers a broader range of events.  According

to Plaintiffs, the "divergence in agency reasoning" between the two rules "lays bare CMS's lack

of reasoned decision-making with respect to the Extreme Circumstances Rule."  Pls.' Mem. at 31.

Not so.  The two rules serve different purposes.  Section 422.100(m) ensures that

beneficiaries have uninterrupted access to care during a disaster or emergency.  Given that

objective, it is not surprising that CMS was more inclusive about the types of events that trigger

§ 422.100(m).  Plaintiffs point to no statutory provision or anything else that compelled CMS to

take the same inclusive approach when it came to affording ratings relief to MA plans or PDPs

unable to fulfill obligations during rare events.  Nor is there any inconsistency in the agency's

approach.  CMS was well within its discretion to place demands on MA plans to ensure beneficiary

16

access to care in the case of disaster or emergency, but to narrow the circumstances of eligibility

for ratings relief when an MA plan falls short in such circumstances.

Plaintiffs object to the Rule based on CMS's failure to defend this supposed lack of parity

when it amended § 422.100(m) in 2022.  Pls.' Mem. at 31.   But CMS adopted the Rule three years

earlier in 2019.  Plaintiffs cannot show that CMS acted arbitrarily and capriciously in 2019 based

on its alleged failure to provide an adequate response three years later.

### 2.        *Dissimilar Treatment of Similarly Situated Medicare Plans*

Plaintiffs also contend that the Rule is arbitrary and capricious because it causes similarly

situated MA plans and PDPs to be treated disparately.  Pls.' Mem. at 32–35.  "The great principle

that like cases must receive like treatment is black letter administrative law."  *Grayscale Invs. LLC*

*v. S.E.C.*, 82 F.4th 1239, 1245 (D.C. Cir. 2023) (quoting *Baltimore Gas & Elec. Co. v. F.E.R.C.*,

954 F.3d 279, 286 (D.C. Cir. 2020)) (alterations omitted).  According to Plaintiffs, the result of the

Rule "is that Medicare plans that are severely impacted by storms for which the Secretary declared

a public health emergency obtain the benefit of a Star Ratings adjustment while Medicare plans

that are equivalently impacted by storms for which the Secretary did not declare a public health

emergency are denied the benefit of an adjustment."  Pls.' Opp'n at 14; *see also* Pls.' Mem. at 32–

33.  As evidence, Plaintiffs point to flooding events in Kentucky in 2022 and Mississippi in 2023

that resulted in Section 1135 waivers for Calendar Year 2025, which Plaintiffs maintain were like

the Broward County storms.  *See* Pls.' Mem. at 35; Pls.' Opp'n at 13–14; *see also* JA at AR00312

(acknowledging the Section 1135 waiver for Mississippi in the 2025 Advanced Notice).

The problem with Plaintiffs' argument is self-evident.  Two plans are *not* similarly situated

if the Secretary declares a public health emergency that affects one but not the other.

CMS therefore is not compelled to treat such plans the same.  As for the examples Plaintiffs offer,

the court can only speculate as to whether the Broward County flooding and weather events were comparable to those in Kentucky and Mississippi. There is no evidence in the Joint Appendix regarding these other weather events and the impact that they had on the provision of Medicare services in those areas. All the court can say is that Plaintiffs concede that they generated a public health emergency and Section 1135 waivers, and the Broward County flooding did not. *See* JA at AR00391 (noting that Plaintiffs "inquired about the section 1135 waiver with HHS and were informed that the State of Florida did not request a section 1135 waiver or an official public health declaration most likely because they did not need outside resources to handle the disaster"). Without record evidence, there is no basis to conclude that Plaintiffs have been treated differently than similarly situated plans.

***

At bottom, Plaintiffs seek to attack indirectly what they cannot directly—that the Secretary did not declare a public health emergency or issue a Section 1135 waiver for the Broward County flooding. *See* 5 U.S.C. § 701(a)(2) (agency action is not reviewable when it is "committed to agency discretion by law"). But their end-around proves unsuccessful. Plaintiffs have not demonstrated that the Rule's predicate condition of a declared public health emergency is arbitrary and capricious. Nor have they shown the Rule to be arbitrary and capricious because of any inconsistency with 42 C.F.R. § 422.100(m). Plaintiffs also have not established that the Rule inevitably leads to disparate results or did so in their case. Plaintiffs are not entitled to relief.

## V.      CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment, ECF No. 10, is denied, and Defendants' Cross-Motion for Summary Judgment, ECF No. 12, is granted.  A final, appealable order accompanies this Memorandum Opinion.

Dated:  May 16, 2025

Amit P. Mehta
United States District Judge

19